1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO
2               WESTERN DIVISION AT DAYTON

3    UNITED STATES OF AMERICA,

4                    Plaintiff,

5        Vs.                    CASE NO. 3:17-cr-83

6    CAMERON A. WALKER,

7                    Defendant.

8
                  TRANSCRIPT OF PROCEEDINGS
9
              HEARING ON DR. MARCIANI's REPORT
10
    PRESIDING:  THE HONORABLE WALTER H. RICE
11
    DATE:  Thursday, March 8, 2018
12
    APPEARANCES:
13
    For The Plaintiff:
14
    BENJAMIN C. GLASSMAN
15   United States Attorney
    By: Sheila G. Lafferty, Esq.
16       Assistant United States Attorney
         200 West Second Street, Suite 600
17       Dayton, Ohio  45402
         (937) 225-2910
18       Sheila.lafferty@usdoj.gov

19   For The Defendant:

20   By: Clyde Bennett, II, Esq.
         119 E. Court Street
21       Cincinnati, Ohio  45202-1203
         (513) 632-9503
22       Clyde@clydebennettthelaw.com

23
    Also Present:  Jennifer Wright, U.S. Probation Officer
24

25

```
 1   Court Reporter:  Debra Lynn Futrell, CRR
                      Federal Building
 2                    200 West Second Street
                      Dayton, OH  45402
 3                    (937) 512-1511
                      Debra_Futrell@ohsd.uscourts.gov
 4
         Proceedings recorded by mechanical stenography, transcript
 5                       produced by computer

 6                              - - -

 7                             INDEX

 8                      D     X     RD

 9   Kara Marciani, Psy.D.  4   34    45

10                              - - -

11                    Thursday, March 8, 2018

12                   IN THE CONFERENCE ROOM

13                         1:37 p.m.
```

14       THE COURT:  CR-3-17-83, *United States versus*

15 *Cameron Walker.*  Sheila Lafferty for the government.  Clyde

16 Bennett for the Defendant.

17     Clyde, normally at these hearings they're fairly short.

18 I wind up asking the majority of the questions.  But in this

19 case, I'm assuming that you want to develop her testimony

20 perhaps to support your motion to withdraw plea.

21       MR. BENNETT:  That's correct, Judge.

22       THE COURT:  Which makes perfect sense to me.  I'm

23 going to turn to you.  Let you take the laboring oar by

24 going first.  Bring out what you want to.  Then we'll go to

25 Sheila.  If I have any follow-up questions, I'll ask them.

1        MR. BENNETT:  Thank you, your Honor.  That's fine.

2        THE COURT:  You're welcome.  Clyde, anything else?

3        MR. BENNETT:  Nothing, your Honor.

4        THE COURT:  Sheila.

5        MS. LAFFERTY:  I don't believe so, your Honor.

6        THE COURT:  I'll see you in the courtroom.  Thank

7    you both.

8             (Recess taken at 1:38 p.m.)

9                        IN OPEN COURT

10                        1:42 p.m.

11        THE COURT:  We have this afternoon case

12    CR-3-17-83, *United States of America versus Cameron Walker.*

13    Mr. Walker is in open court with counsel, Mr. Clyde Bennett.

14    The government is present in the person of Assistant United

15    States Attorney, Ms. Sheila Lafferty.  Ms. Jennifer Wright,

16    United States Probation Department, is present as well.

17        We are here for purposes of a hearing based upon a

18    report from the Forensic Psychiatry Center for Western Ohio

19    furnished the Court under date of January 12th of this year.

20    The evaluator was Dr. Kara Marciani, Psy.D, who is present

21    in court.

22        Doctor, would you be good enough to come forward.

23                   KARA MARCIANI, Psy.D,

24             after having been first duly sworn,

25                 testified as follows:

1    THE COURT:  The first questioner will be Mr.

2  Walker's attorney, Mr. Clyde Bennett.

3    MR. BENNETT:  Thank you so much, Judge.

4                    DIRECT EXAMINATION

5  BY MR. BENNETT:

6  Q.    Good afternoon, Doctor.

7  A.    Hey, good afternoon.

8  Q.    Doctor, you had an opportunity to become acquainted

9  with Cameron Walker as part of an evaluation, correct?

10  A.    That is correct, yes.

11  Q.    When did that occur?

12  A.    The evaluation occurred on December the 19th of 2017.

13  Q.    How long was the evaluation, how long did it take?

14  A.    Sure.  So I met with Mr. Walker face to face for

15  approximately 2 hours.  Then there was some testing that was

16  completed subsequent to that meeting that our office manager

17  does.  So it was 2 hours face to face.  Then the testing

18  with interpretation and report writing.

19  Q.    This sounds kind of axiomatic, but you wouldn't know

20  what his state of mind was or what his intellect may have

21  been back on May of 2017, would you?  Based on your

22  acquaintance with him in November?

23  A.    Sure.  Based on my acquaintance with him in December, I

24  can certainly -- I can give some inferences regarding his

25  intellect, given that intellectual ability generally is

1    stable over time.  So typically the manner in which an

2    individual presents at one point in time generally reflects

3    their level of intellectual ability at other periods of time

4    unless there is some sort of intervening problem like a

5    stroke or a head injury.

6    Q.    You're not aware of any intervening problems?

7    A.    I am not aware of any intervening problems.

8    Q.    Whatever his intellectual capacity or learning ability

9    may have been when you actually was acquainted with him and

10   evaluated him, it's safe to say that probably 4 or 5 months

11   earlier that probably was his condition also, is that what

12   you're telling the Court?

13   A.    That is what I'm telling the Court, yes.

14   Q.    With respect to his learning ability or disability, did

15   you have an opportunity to evaluate him with respect to what

16   type of learning ability you thought he may have had back in

17   December when you evaluated him?

18   A.    So I did not evaluate him for any specific learning

19   disabilities.

20   Q.    Did you make a conclusion about any learning disability

21   he may have had?

22   A.    Yes.  What he told me is he thought he did in fact

23   suffer from a specific learning disability.  He as well told

24   me that he suffered from deficits in attention and

25   concentration.  His mother in fact verified that when we

1   obtained collateral information from her.  Based on his

2   report and his mom's report, it appears that he may have

3   some learning disabilities.

4   Q.   Based on the history that was provided by Mr. Walker

5   himself and his mother, you noted that he may have an

6   unspecified learning disability, correct?

7   A.   Correct.

8   Q.   Were you done?

9   A.   Yes, sir.

10  Q.   You didn't see anything to the contrary that would

11  indicate that he was learning disabled, did you?  Do you

12  understand my question?

13  A.   I don't.  I don't.

14  Q.   Well, if somebody says, "hey, look I have a learning

15  disability," like he said and his mother said he's got

16  learning disabilities.  He told you how he couldn't focus

17  and so forth in school.  Did you see anything in the

18  contrary as far as his purported learning disability?

19  A.   Okay.  So the way in which you typically are able to

20  detect learning disabilities comes with, it's usually bears

21  itself out in academics.  An individual will have average

22  intelligence but they will perform lower than that in their

23  academics.  They'll have average intelligence, but they may

24  read at a level that is below where you would expect them to

25  given their grade and their level of intelligence.

1          So when folks have specific learning disabilities, it

2     doesn't tend to affect their global functioning.  You

3     generally see it instead in specific areas.  So they may

4     struggle with math as an example.

5     Q.    They can also struggle with reading too, correct?

6     A.    Sure, sure, absolutely.

7     Q.    And the information that you received as part of your

8     evaluation with respect to his academic performance say in

9     school, it was consistent with him having a learning

10    disability, wasn't it?

11    A.    I had two informants that told me he had a learning

12    disability.  I attempted to get school records to see what

13    they had to say, but when I requested the records, the

14    response I got was that they had no records on him.

15    Q.    You were also advised by somebody that he was in an

16    Individualized Education Program?

17    A.    That's what he told me.

18    Q.    That would, also, be consistent with having a learning

19    disability, correct?

20    A.    Potentially, though.  An IEP also could be done to

21    address behavioral disturbances.  An individual having an

22    IEP doesn't necessarily mean that they are learning disabled

23    or intellectually impaired.

24    Q.    I guess my question, doctor, was this.  If a person is

25    in an Individualized Education Program as compared to being

1   with the rest of his peers in the rest of the general

2   population in the school, being in that IEP that is

3   consistent with having a learning disability.  It doesn't

4   necessarily mean that you're in there because of that, but

5   that's consistent with having a learning disability, isn't

6   it?

7   A.   So I have a couple of things to say about that.  The

8   first is that if an individual has an IEP, that doesn't mean

9   that they are necessarily in special education programming

10  or removed from their peers with regard to their academic

11  programming.  Oftentimes, kids will have IEPs and

12  recommendations will be for them to participate in regular

13  classes but with some accommodations.  As an example, if a

14  kid has trouble with reading, a common accommodation is for

15  them to have their tests read to them aloud or they may be

16  allowed to have extra time on tests.  They as well may be

17  allowed to use a calculator when doing math problems as an

18  example.  So if somebody has an IEP, that doesn't mean that

19  they necessarily are in special education programming.

20  They're not necessarily in classes with kids that are

21  intellectually disabled.

22  Q.   I appreciate that, doctor, but my question wasn't

23  whether being in an IEP specifically means that you have a

24  learning disability.  That wasn't my question.  My question

25  is this.  Isn't it true that if you are in an IEP, that

1    could be consistent with you having a learning disability?

2    A.    Like I said, kids that have IEPs may have a learning

3    disability.  They also may have some conduct disorders or

4    behavioral disturbances.

5    Q.    He also reported trouble focussing?

6    A.    Yes.

7    Q.    Trouble focussing, how is that manifested in general?

8    When somebody can't concentrate and focus on a particular

9    issue, how is that manifested generally?

10   A.    You're asking me, how is it behaviorally manifested?

11   Q.    Or cognitively manifested if you can't focus.  Say, for

12   example, if somebody was to say, I give you a ten-page

13   article there.  I want you to read it.  The person has

14   difficulty focussing.  Could that have an impact on their

15   ability to comprehend and read that document?

16   A.    Oh sure, absolutely.

17   Q.    And it was reported that he had trouble focussing, and

18   you noted that in your report, correct?

19   A.    Yes, he reported a history of that.

20   Q.    Let's talk about his infirmities and conditions.

21   Depression.  Did you note any type of depression that Mr.

22   Walker may have experienced?

23   A.    At the time of the evaluation, he reported situational

24   depression.  So depression that was occurring secondary to

25   his legal involvement and his confinement.  What he said is

1    that he was without any history of depression that occurred

2    outside of circumstances.  So essentially what he said is

3    that he experienced normal reactions to distressing life

4    events.

5    Q.   I thought I understood your report to say that he

6    experienced anxiety with respect to his legal predicament --

7    A.   Yes.

8    Q.   -- as compared to depression?

9    A.   He reported both depression and anxiety.

10   Q.   Let's split that up.  What is depression?

11   A.   So, depression essentially is a mood disorder that

12   manifests itself in various ways with folks but oftentimes

13   occurs secondary to stressful life events.  Folks who have

14   depression may have trouble sleeping.  They may feel sad.

15   They may cry.

16   Q.   He reported a history of depression even before his

17   legal predicament, correct?

18   A.   What he said is that he had some mood-related

19   disturbance that occurred secondary to being shot at 21

20   years of age.

21   Q.   That would be before he was incarcerated and before his

22   current legal predicament --

23   A.   Yes.

24   Q.   -- based on the chronological sequence of events?

25   A.   Yes.

1    Q.    Can depression have an impact on your cognitive

2    perceptions and your intellectual perceptions of a

3    circumstance or an issue?  Do you understand what I'm

4    saying?

5    A.    I'm not sure what you're asking me.

6    Q.    Here's what I'm asking.

7    A.    Okay.  Ask me again.

8    Q.    Say I'm depressed and I'm experiencing the

9    manifestations of depression, okay?

10   A.    Okay.

11   Q.    And somebody confronts me with a legal issue.  They

12   want me to understand that issue.  They want me to respond

13   to it and they want me to act on it.  Couldn't depression

14   have an impact on that scenario?

15   A.    So the best way I can answer that is to say that when

16   folks are severely depressed as in -- severely depressed as

17   in they are not getting out of bed, they are not taking a

18   shower, they are almost catatonic, they certainly are known

19   to have difficulty with comprehending information.  You

20   typically though just see that in folks that are very

21   severely depressed.

22   Q.    Doctor, isn't it true that back on May 31st or May 30th

23   of 2017 you didn't know the extent of depression that he

24   might have been experiencing?  You didn't know that because

25   you didn't know him back then, did you?

1    A.    That's true.

2    Q.    But you don't know -- if he was laying over there in

3    the jail bed not being able to get out of bed, you just

4    don't know, right?  You don't know how the extent of

5    depression he was experiencing or whether or not he was

6    experiencing it at all, correct?

7    A.    Correct.  I can tell you, though, that he denied any,

8    like, history of loss of functioning in response to his

9    mood-related symptoms.  So he characterized his depression

10   as never being extremely severe.

11   Q.    What about panic attack?  What is a panic attack?

12   A.    Okay.  So a panic attack is kind of a discrete episode

13   of intense anxiety.  Individuals who experience those tend

14   to suffer some very acute physiological symptoms.  As

15   examples, they'll have shortness of breath.  They will feel

16   as if their heart is racing.  They'll feel like a tightness

17   in their chest.  Oftentimes folks will equate that sensation

18   to feeling as if they're having a heart attack.

19   Q.    You just described the physical manifestations of

20   anxiety.  How about the mental ones?  Isn't it true that if

21   a person is experiencing anxiety or that's anxious,

22   sometimes they're paranoid or they have irrational or unreal

23   thoughts about a situation or a circumstance if you're

24   anxious?

25   A.    I wouldn't say it's irrational.  If somebody is

1    anxious, they may be hypervigilant.  And what I mean by that

2    is that, let's say they're anxious as a result of having

3    been like a victim of a crime.  They may thereafter have

4    feelings of anxiety in situations that remind them of that

5    scenario and they may be what we call hypervigilant.  I.e.,

6    they may pay a lot of attention to their surroundings and be

7    very focussed on matters about keeping themselves safe.  You

8    don't see folks that are just anxious having like delusions

9    wherein they misperceive or grossly misunderstand their

10   environment.  It's more so about them managing their current

11   actual environment.

12   Q.   As far as anxiety, I think I understand -- well, let me

13   ask you a question.  Anxiety, you said, is not the same as

14   having delusions or being psychotic?

15   A.   Correct, yes, they are not the same.

16   Q.   I understand that.  Isn't it true that if you are

17   experiencing anxiety, the way you perceive or receive a set

18   of circumstances can be impacted by the fact that you're

19   anxious, so you might not be looking at it realistically as

20   it actually is.  You may look at it in unrealistic ways

21   because you're experiencing anxiety.  Say for example, I'm

22   experiencing anxiety and I'm driving back to Cincinnati and

23   I'm on the road.  I'm thinking, man, I might be in a car

24   accident.  I might die today.  Something may happen to me.

25   Isn't that anxiety also?

1    A.    Sure.   Somebody could experience anxiety in that

2    circumstance.

3    Q.    You concentrated on the physical manifestations of

4    anxiety.   There's also cerebral or intellectual

5    manifestations of anxiety also, isn't it?

6    A.    I don't know what you mean when you say cerebral and

7    intellectual.   Being anxious doesn't make you dumber.   When

8    I hear intellectual, that's --

9    Q.    I'm sorry, doctor.   I didn't hear what you said, the

10   last thing you said.

11   A.    So when you say cerebral or intellectual

12   manifestations, being anxious doesn't make you dumber.   It

13   doesn't lower your cognitive ability.

14   Q.    Oh, I'm not taking about being dumb.   I'm talking about

15   your thought process, what you're thinking.   An example I

16   gave you was, instead of normally driving down the highway

17   saying, I'm going to get there safely.   If I'm experiencing

18   anxiety, then I'm thinking I might die.   I might get in a

19   car accident.   When in fact that might be unrealistic, but

20   I'm feeling that way because I'm anxious or I'm experiencing

21   anxiety?

22   A.    So what you're talking about is catastrophizing.

23   Q.    That is a symptom of having anxiety, correct?

24   A.    So catastrophizing can lead to anxiety.   So the way we

25   feel is governed by our thoughts.   So how I think about a

1    situation will determine how I feel about it.  So if I'm

2    going down the highway, thinking, oh, I'm going to get in a

3    car accident, then I'm going to feel anxious.

4    Q.    Could it be that you're anxious and you feel like

5    you're going get in a car accident.  I'm trying to argue

6    chicken before the egg, but it doesn't necessarily happen

7    going that far, but you can have anxiety and think in a

8    catastrophic way because of your anxiety?

9    A.    Typically it works in reverse.  The way you think

10   determines how you feel.  You may then sort of snowball on

11   that.  But our feelings don't just sort of occur.  They're

12   tied to how we think about what's going on in our world.

13   Q.    But you did document the fact that he had panic attacks

14   on page 5 of your report?

15   A.    Yes.  He reported a history of anxiety, that's true.

16   Q.    He also stated and you documented the fact that he was

17   easily overwhelmed by stressful life events?

18   A.    That's what he said, yeah.

19   Q.    Did you find anything inconsistent with that notation

20   that he provided to you?

21   A.    Not necessarily, no.  I'm just saying that's what he

22   told me, that he was easily overwhelmed.

23   Q.    That's what you documented, correct?

24   A.    Uh-huh (affirmative response), yes.

25   Q.    You said like stressful life events like his current

1    legal involvement, correct?

2    A.   Yes.

3    Q.   If a person is easily overwhelmed by normal life events

4    like his legal predicament, could that have an impact on his

5    ability to engage -- strike that.  Could that have an

6    ability on his ability to knowingly engage into a legal

7    affair or a legal issue?  Do you understand what I'm saying?

8    Let me say it this way.

9         Suppose like you freak out about things and it

10   overwhelms me.  And by overwhelm, I think that means that I

11   think that's another cognitive circumstance if you're

12   overwhelmed by something.  If you're overwhelmed by stress,

13   that can have an impact how you perceive or receive things

14   or evaluate things, correct?

15   A.   So I think there's a difference of being overwhelmed

16   and being incapacitated.  So yes, folks can be overwhelmed

17   by stressful life events.  Yes, it may affect the manner in

18   which they approach problems that they are asked to solved.

19   But being overwhelmed doesn't necessarily mean that one is

20   incapacitated or unable to engage in problem-solving

21   activities.

22   Q.   I didn't use the word "incapacitated."  I think you

23   did.  My point was, if you're overwhelmed by an issue and I

24   think you answered it, that can have an impact on how you

25   involve yourself with an affair?

1    A.    Sure.

2    Q.    Most definitely a legal affair, correct?

3    A.    Sure.

4    Q.    I think you noted that, that he's overwhelmed by

5    stressful life events like the present legal involvement,

6    correct?

7    A.    Yes, that's what he told me, yeah.

8    Q.    And being overwhelmed, that could have an impact on

9    whether or not he's rationally entered into a legal affair

10   or an agreement, right?

11   A.    You're asking if that would affect his decision-making

12   ability?

13   Q.    Potentially -- not whether it did, but could it

14   potentially have an impact on his decision-making, yes,

15   that's exactly what I'm asking.

16   A.    Sure, sure, anything is possible.

17   Q.    That's a little more than possible.  That's plausible

18   as a matter of psychology, isn't it?

19   A.    Everything relies on a continuum.  It just depends on

20   the degree to which he was overwhelmed in that moment, in

21   that situation.  It also would be dependent upon what

22   resources are available to him.  So if you have somebody who

23   is feeling stress but they have an attorney or somebody who

24   they trust who can give them counsel, who can assist them,

25   the impact on decision-making is going to be different than

1   if you have somebody who is overwhelmed and has no resources

2   or ability to navigate a situation.

3   Q.   Let's say if you have a person that's overwhelmed with

4   the predicament of going to prison for the rest of his life

5   and he doesn't trust his lawyer, that could definitely be

6   overwhelming, couldn't it?

7   A.   It would be a problem.  That's for sure.

8   Q.   That would be a major problem, wouldn't it, as far as

9   being overwhelmed and stressed out, correct?

10  A.   Yeah, that would be a problem.

11  Q.   Let's suppose you have to sit in a cell for 18 to 24

12  hours a day and face the choice of being in prison for the

13  rest of your life and you feel like your lawyer has

14  abandoned you, that can be a very overwhelming and stressful

15  event, couldn't it?

16  A.   Sure.  Some folks would find that stressful.

17  Q.   Are you familiar with the mind and the body and how it

18  responds if it's drug addicted and then there's no longer a

19  consumption of drugs?  I think they call it withdrawal.  Do

20  you know what I mean?

21  A.   Yeah, I know about withdrawal.

22  Q.   What happens to the mind, first of all?  Say, for

23  example, a person is addicted to Percocet.  They're addicted

24  to Xanax.  They are addicted to marijuana and they smoke it

25  every day.  All of a sudden they're no longer -- they've

1    been doing this for years and now they're not consuming

2    anything.  What impact does that have on the mind?

3    A.    Sure.  Depending on the substance and depending on the

4    individual's preexisting coping skills, some folks

5    experience like depression.  That is, they rebound from

6    that.  But episodes of depression after they discontinue

7    substance use.

8    Q.    Do you know whether or not Mr. Walker had withdrawal

9    symptoms back in May of 2017?

10   A.    I do not.

11   Q.    But you do know that he has a very strong history of

12   drug abuse, prescription drugs, and illicit drugs.  You know

13   that, right?

14   A.    Yes, yes.  He reported an extensive history of drug

15   use.

16   Q.    You also know that he was incarcerated in August of

17   2016, correct?

18   A.    That sounds familiar, yes.

19   Q.    Then he was released in May 2017, correct?

20   A.    Uh-huh (affirmative response).

21   Q.    Up until August of 2016, he reported to you that he

22   basically was addicted to prescription drugs and marijuana,

23   correct?

24   A.    Yes.

25   Q.    You don't know what impact -- that 7-month stint or

1    8-month stint before he actually entered a plea of guilty,

2    you don't know what his mindset was or what impact the

3    withdrawal may have had on his mind, do you?

4    A.    Sure.  And I can't tell you definitively what effect it

5    had on him, but I can tell you that most folks who are

6    withdrawing from alcohol or drugs, even after prolonged

7    periods of use, do not experience a substantial

8    deterioration of their cognitive functioning or they don't

9    become psychotic or otherwise detached from reality.

10   Q.    I'm not talking about psychosis or a disconnect with

11   reality.  I'm not talking about the impact that withdrawal

12   can have on your intellectual capacity, your reasoning.

13   A.    Sure.

14   Q.    It can have an impact on that.  Notwithstanding the

15   fact you're not psychotic, which is an extreme, I'm not

16   talking about the extreme.  Whether or not it can have an

17   effect on your intellectual reasoning and your ability to

18   comprehend and understand what you're doing.

19   A.    Right.  The reason I introduced the idea of psychosis

20   is typically when folks grossly lose their ability to

21   reason, it's related to an alteration in their sense of

22   reality which is psychosis.  So that's why I introduced

23   psychosis into my answer.

24   Q.    What was your answer to my question, though; my last

25   question?

1    A.    That most folks when they are withdrawing from

2    substances of abuse typically do not experience a dramatic

3    decrease in their cognitive ability or psychosis.  Those

4    would be the 2 things I would expect to see if somebody were

5    to say that they weren't able to -- being grossly impaired

6    and couldn't make decisions after a period of substance use

7    and then withdrawal.

8    Q.    Do you know whether or not the apparent withdrawal --

9    because I'm assuming there's no drugs in the Montgomery

10   County Jail.  The withdrawal from drugs by Mr. Walker, you

11   don't know what impact, if any, it had on his cognitive

12   ability, though, do you, when he entered that plea back in

13   2017 before you had contact with him?

14   A.    No but I can tell you that I had access to some records

15   from the Montgomery County Jail that did not suggest that he

16   was suffering from any significant mood-related or psychotic

17   symptoms while he was in their care for a period of time.

18   In fact, the only thing they ended up prescribing him was

19   Trazodone which was a sleep aid and he was cleared to work.

20   Those things would suggest that he was not substantially

21   impaired while incarcerated and presumably without access to

22   substances of abuse.

23   Q.    Everybody that is substantially impaired at the jail,

24   that's not always noticed by the agents and employees of the

25   jail, is it?

1    A.    Sure.   Somebody could be impaired but it not come to

2    their attention.   They did in fact talk to him.   He in fact

3    denied any clinical depressive or neurovegetative symptoms.

4    Q.    When were these conversations they had with Mr. Walker?

5    A.    So the notes that I had access to were dated March 13,

6    2016 through May the 2nd.   No, no, no, I'm sorry.   I'm

7    sorry.   Those are the Miami Valley notes.

8         I'd have to look for the exact dates.   I know he was

9    given Trazodone on September the 14th, 2016.   So there were

10   notes in advance of that.

11   Q.    So are you saying that this conversation they had with

12   him with respect to his cognitive ability was before then?

13   A.    Yes.

14   Q.    You know that for a fact?

15   A.    Yes, because the Trazodone -- they prescribed the

16   Trazodone after talking to him.

17   Q.    So his cognitive ability that you're discussing would

18   be before September of 2016?

19   A.    Correct.

20   Q.    Again, you don't know what his cognitive ability was in

21   May of 2017, do you?

22   A.    I don't but I can tell you that if we look at kind of

23   past behavior is a predictor of future behavior, the fact

24   that he didn't experience any significant symptoms during a

25   prior incarceration, that gives us a window of insight into

1   how he might have been presenting at another time under a

2   similar condition.

3   Q.    But there are circumstances that can change your

4   cognitive ability or change the stress that you're

5   experiencing or change how you feel that can occur while

6   you're incarcerated?

7   A.    Sure, sure.  Something could have intervened, but again

8   this is the best picture that I can give you.

9   Q.    Such as being confronted with the fact that you may be

10  in prison for the rest of your life?

11  A.    Sure.

12  Q.    Could that be such an event?

13  A.    Sure, that would be stressful, sure.

14  Q.    The treatment that you discussed that Mr. Walker

15  received when he was at the Montgomery County Jail consisted

16  of a sleeping pill, correct?

17  A.    What it is it's an antianxiety/antidepressant that

18  facilitates sleep.  So it's commonly prescribed when folks

19  are having trouble sleeping.

20  Q.    Let's be clear, Doctor.  Is it treatment for anxiety

21  and depression or is it a pill to allow you to go to sleep?

22  A.    They prescribed it to him to help him sleep.  That's

23  what it said in the record.

24  Q.    For example, if you have an inmate that says, you know,

25  "I can't sleep at night," he could get that pill also,

1    correct?

2    A.    Sure.

3    Q.    That pill is not specifically for anxiety and

4    depression, correct?  It's for sleep, correct?

5    A.    So it's primarily prescribed to facilitate sleep.

6    Q.    You're not aware of any medication that Mr. Walker

7    received -- when he was in jail from August 2016 all the way

8    up to May of 2017, you're not aware of any medication that

9    he received for depression, anxiety, or anything like that,

10   are you?

11   A.    Correct.

12   Q.    Specifically, for those 2 things?

13   A.    Right.  The records I received indicated that the only

14   thing he'd been prescribed was Trazodone during the time

15   period which I mentioned.

16   Q.    It's also true to say that all of these years that he's

17   been doing prescription drugs and other type of drugs, he's

18   never participated in any type of treatment program or never

19   received medication for this type of ingested or consumption

20   of drugs, has he?

21   A.    He was supposed to go to CADAS and he was supposed to

22   get treatment there and didn't complete the treatment

23   program.  Didn't show up like he was supposed to.

24   Q.    So are you saying that yes, it's correct that he never

25   received treatment?

1    A.    So, it appears that he had the opportunity to do

2    treatment.  I requested records from them.  Hadn't gotten

3    anything.  I don't know if he showed up once or twice or if

4    he showed up ten times.  I don't know.

5    Q.    Doctor, so I think your answer is that you're not aware

6    of him receiving treatment for consumption of drugs in the

7    past, is that correct?

8    A.    He may have.  I don't know that he did or didn't.  What

9    he said is that he was referred to treatment and he didn't

10   go as often as he should have.

11   Q.    Suicidal ideology or suicidal ideation, you noted that

12   in your report also on page 6, right?

13   A.    Yes.  He had reported that.

14   Q.    Based on your evaluation, did you confirm that?

15   A.    Yeah.  What he said is that he -- after he got shot.

16   Q.    Are you saying yes, you confirmed it?

17   A.    Yes.  Yes.  It was in my report because he told me.

18   That's how it got in my report.

19   Q.    Most of what is in your report when you're evaluating

20   psychiatrically is going to be a history they provide.

21   There may be some records from other episodes.  It's typical

22   when you evaluate somebody, the vast majority of the

23   information is going to be a historical narrative from that

24   person and their family, right?

25   A.    Yes, right.

1    Q.    This is no different, correct?

2    A.    Right.

3    Q.    From that you were able to complete your report,

4    correct?

5    A.    Uh-huh.

6    Q.    Like you did in so many other cases?

7    A.    That's correct.

8    Q.    In this case you noted he had suicidal ideation.  What

9    is suicidal ideation?

10   A.    That's thoughts of suicide.  Yeah, what he said is that

11   he had suicidal ideation in response to being shot and then

12   during kind of the initial phases of his incarceration.

13   Q.    Did he have suicidal ideation in May of 2017?  You

14   don't know that, do you?

15   A.    I don't know specifically to May of 2017.

16   Q.    So if I told you that he did, you couldn't dispute

17   that, could you?

18   A.    I don't know one way or the other.

19   Q.    I'm almost done, doctor, but let me ask you this.

20   A.    Uh-huh (affirmative response).

21   Q.    Part of your assessment and evaluation includes the

22   legal history of the person that you're evaluating?

23   A.    Yes.

24   Q.    In this case, you evaluated Mr. Walker for his legal

25   history, correct?

1    A.    I did, yes.

2    Q.    What you learned was is that he did not have any

3    experience with felony matters, correct?

4    A.    Yeah, what he told me was he had convictions for theft

5    and driving without a license and then there was a

6    possession of drugs charge that was also in his record.

7    Q.    He had never been to prison before?

8    A.    Not to my knowledge, no.

9    Q.    As a matter of fact, the time that he had been in jail

10   from August 2016 up until May of 2017, that was the longest

11   time he'd ever been incarcerated, correct, based on the

12   information that you had.

13   A.    Uh-huh.

14   Q.    Right?

15   A.    Right.

16   Q.    With respect to his intellectual capacity, you made a

17   notation, a specific notation about his intellectual

18   capacity on page 14, didn't you, of your report?

19   A.    Yeah.   In the Mental Status section, I estimated his

20   level of intellectual ability.

21   Q.    It was below average?

22   A.    No, not below average.

23   Q.    Low average?

24   A.    Low average, yes.

25   Q.    Tell me, what is low average?   What does that mean?

1    A.    So average starts at 80.  You get 80 to about 100, 110,

2    115.  That's average.  I would say that he probably falls

3    about 90 to a hundred, somewhere in there.  So the lower end

4    of the average range.

5    Q.    If you are low average -- this is your opinion.  If

6    you're low average, does that give you the cognitive

7    ability, on your own by yourself, to understand and

8    decipher, say, legalese and legal issues?

9    A.    To the same extent that anybody else would be able to

10   do that.  I mean, there are folks that are mid average and

11   high average intelligence who don't understand legalese.

12   It's a specialized area.  But I would have no question about

13   somebody having low average intellectual ability being able

14   to understand legal stuff with the assistance of an attorney

15   just like anybody else.

16   Q.    But my question was, without the assistance of

17   attorney.  I'll get to the assistance part.  But my initial

18   question was, on his own.

19   A.    I would think that it's my opinion they'd be able to do

20   that to the same extent that anybody else would be able to

21   do that.

22   Q.    Do you know whether or not because of his low average

23   intellectual functioning, whether or not Mr. Walker was able

24   to understand the agreement that he reached back in May of

25   2017?

1    A.    What I can tell you is that he told me that he wasn't

2    happy about that agreement but that he entered into it after

3    essentially what he described as a knowing and intelligent

4    manner.  He wasn't happy about the fact he was being

5    prosecuted for this case.  He thought that it was ridiculous

6    that he was out being charged for this offense when there

7    were other people out there selling drugs.  He didn't voice

8    any thoughts about the agreement *per se*.  He was more upset

9    about the fact that the government was coming after him when

10   there are a lot of other drug dealers out there who are not

11   getting prosecuted.

12   Q.    You said something that I thought was important.  You

13   just told Judge Rice that you thought he knowingly and

14   intelligently entered a plea.  Did I hear you say that?

15   A.    Yeah.

16   Q.    Did you document that opinion anywhere in your report?

17   A.    No, huh-uh, because it wasn't necessarily germane to

18   the question that I was asked to answer.

19   Q.    So you're telling the Judge that a person with a

20   history of depression, anxiety, low average intellectual

21   functioning, a learning disability, who could have been

22   experiencing withdrawal symptoms, you're saying -- you're

23   opining that this person in your professional opinion

24   knowingly and intelligently entered a plea?

25   A.    Yeah.  No, he absolutely could do that.  What he told

1    me --

2    Q.   No, no, no.  Did he do that?  Do you know for a fact

3    that he did that?

4              THE COURT:  Mr. Bennett --

5              MR. BENNETT:  I'm sorry.

6              THE COURT:  -- respectfully, I know what you're

7    trying to do, but you're interrupting the witness.

8              MR. BENNETT:  I apologize, Judge.

9              THE COURT:  Accepted.  There's no need to

10   apologize.

11        Back up and read the first question.  Answer it,

12   doctor.  And then, Mr. Bennett, you may follow up.

13             THE WITNESS:  Thank you.

14             (Record read.)

15             THE WITNESS:  So what he told me is that he talked

16   to his attorney about his plea options, that he wasn't happy

17   about the fact that he was in trouble with the law but that

18   he essentially had entered into an agreement because he knew

19   he was facing an extended period of time and that he had

20   followed his attorney's advice.

21   BY MR. BENNETT:

22   Q.   Right.  Anything else?

23   A.   Just that he, in his words, thought it was bull shit

24   that he was being prosecuted for this, that there were other

25   folks that were engaging in the same activity who were doing

1    it and not suffering consequences.

2    Q.    You said he said it was BS.  But he also told you, he

3    didn't sell any drugs anymore.  Is that what he meant when

4    he said it was BS because I think you noted that on page 11

5    of your report that he denied selling drugs anymore.  Page

6    11.

7    A.    Denied selling drugs to anybody -- oh, in accordance

8    with this set of offenses?

9    Q.    Yes.  I'm on page 11, doctor, where you say that he

10   accordingly indicated that he did not knowingly sell the

11   drug to anyone.

12   A.    Fentanyl.  Because he was selling drugs for somebody

13   else.

14   Q.    If you go to page 11 of your report.

15   A.    Okay, hang on one second.

16        Yeah.  He was selling heroin at the time.  Denied any

17   history of selling fentanyl.  He accordingly indicated that

18   he did not knowingly sell the drug to anyone.

19   Q.    That was with respect to the case that he was convicted

20   of, correct?

21   A.    Correct.

22   Q.    Is that what he meant when he was saying this is BS?

23   A.    A combination of things.  What he said was that the

24   victim was also selling drugs.  So he didn't see what the

25   big deal was.  That he also was upset because his aunt had

1    overdosed and he said nobody went after the person that sold

2    her the drugs that she used to overdose.

3    Q.    Let's go back to this.  Then this is going to be my

4    last question.  Earlier you stated that he knowingly and

5    intelligently entered a plea.  I asked you some questions

6    about after that, to find out what your basis of that was.

7    He never used the word "knowingly and intelligently," did

8    he?

9    A.    No.  That's my assessment based on the fact he is

10   without any significant cognitive impairment.  He also is

11   without any history of psychosis.  In addition, he has a

12   history of mood disturbance but by his report the

13   disturbance never resulted in a significant loss of

14   functioning.  Given those things, there would be no reason

15   that he would not be able to engage in that process.  He as

16   well indicated that he had talked that process through with

17   his attorney and wasn't happy about the fact that he was in

18   trouble but knew that he needed to, you know, resolve the

19   case.

20   Q.    Did he say why he needed to resolve the case?

21   A.    Because he didn't want to go away for any longer than

22   he had to.

23   Q.    Did you see the Plea Agreement itself?

24   A.    I've got just like a summary of what happened in regard

25   to the case, but I don't think I have the actual -- I have

1    not seen the actual Plea Agreement.

2    Q.    You haven't seen the length of the document or the

3    verbiage or anything like that?

4    A.    No.  I've seen sort of excerpts of it as I believe

5    they're represented in the Presentence Investigation report.

6    So the degree to which those are true to the actual

7    document, that's what I've seen.

8    Q.    Doctor, thank you so much.

9    A.    Yeah, you're welcome.

10              THE COURT:  Thank you, Mr. Bennett.

11         Doctor, I have one question before the Assistant United

12    States Attorney speaks with you.

13              THE WITNESS:  Yes, sir.

14              THE COURT:  If you'd go to page 11, the second of

15    3 paragraphs in the section titled Offender's Account of The

16    Offense Charged.

17              THE WITNESS:  Yes.

18              THE COURT:  If you'd read that paragraph, it

19    begins, In addition.

20              THE WITNESS:  So, In addition, Mr. Walker stated

21    that he --

22              THE COURT:  Just read it to yourself.

23              THE WITNESS:  I was going to say.  That was my

24    best reading voice.

25              THE COURT:  I understand.

1          THE WITNESS:  (Witness examining document.)  I

2     have it to myself.

3          THE COURT:  The last sentence reads, quote:  "He

4     accordingly indicated that he did not knowingly sell the

5     drug to anyone.  What is meant by "the drug"?

6          THE WITNESS:  Fentanyl.

7          THE COURT:  Thank you.  Any followup, Mr. Bennett,

8     before I go to Ms. Lafferty?

9          MR. BENNETT:  No, Judge Rice.

10         THE COURT:  Ms. Lafferty.

11         MS. LAFFERTY:  Just a few follow-up questions.

12                        CROSS-EXAMINATION

13    BY MS. LAFFERTY:

14    Q.   First of all, the whole purpose in you examining Mr.

15    Walker was pursuant to a motion that Mr. Bennett filed, is

16    that correct?

17    A.   You know, I have no idea how it came to us.  We got an

18    order to evaluate Mr. Walker.  So we evaluated him.

19    Q.   Let me read from the report from the motion that was

20    filed by him.  In it Mr. Bennett indicates:  Counsel

21    believes there is reason to believe that the Defendant is

22    presently suffering from a mental disease or defect which

23    renders him mentally incompetent to the extent he's unable

24    to understand the nature and consequences of the procedures

25    against him and is unable to properly assist counsel in his

1    defense.  Did you evaluate him as it relates to a mental

2    disease or defect?

3    A.    Yes.  As part of the historical information we get and

4    my mental status evaluation as well as the collateral

5    information I got from other folks.

6    Q.    As it relates to what he requested or what he believed

7    Mr. Walker was suffering from, your opinion as to that?

8    A.    Do I think he has a mental disease or defect?  I don't.

9    Q.    Let me ask you a few follow-up questions to some of the

10   questions Mr. Bennett asked you.  The first area he asked

11   you about was education.  That you indicated that Mr. Walker

12   represented to you that he had an IEP in place while in high

13   school, is that correct?

14   A.    Correct.

15   Q.    You also indicated that you spoke to his mother?

16   A.    His mother, yes.

17   Q.    His mother indicated he did or did not have an IEP in

18   place?

19   A.    She didn't know that he did.

20   Q.    Are you familiar in the course of examinations you've

21   done in the past with IEP programs?

22   A.    Yes.

23   Q.    What is your understanding as to how that is put into

24   place, is a parent involved in that process or made aware of

25   that process?

1    A.    Typically what they do is the school will amass all the

2    data they need.  There will be testing involved, teacher

3    reports, that kind of stuff.  Sometimes they will also get

4    information from the parent regarding the student's

5    functioning.  They'll have them fill out, oh, checklists and

6    that kind of stuff.  They do what I believe to be an annual

7    meeting wherein they review the contents of the IEP for the

8    upcoming year.

9    Q.    Do you know whether or not there is parental

10   participation in that, if you know?

11   A.    Yeah.  Oftentimes they're signed off on by whoever has

12   custody of the kid.

13   Q.    In this particular case, as it relates to education,

14   Mr. Bennett asked you about learning disabilities and there

15   was no known learning disability that you were made aware

16   of, is that correct?

17   A.    So he told me that he had a learning disability.  His

18   mom said that he had problems with attention.  I was hoping

19   to verify that by getting school records but we weren't able

20   to get records.

21   Q.    To be clear, once he graduated from high school, he

22   then attended Sinclair, is that correct?

23   A.    I don't know about that.

24   Q.    Taking -- I'm not sure if I read that in your report.

25   A.    He may have and I'm just not remembering it at this

1   moment.

2   Q.    My apologies.  It may have been in the Pretrial

3   Services Report.  The second area that Mr. Bennett asked you

4   about was as it relates to depression and anxiety.  Did Mr.

5   Walker relate to you that at any point in time while he was

6   incarcerated at the Montgomery County Jail that he was in

7   need of medication or counseling for depression or anxiety

8   attacks or panic attacks?

9   A.    Yeah.  He didn't mention having panic attacks at the

10  jail.  He did report that he had gotten something to help

11  him sleep but he also reported that he'd been cleared so

12  that he could work.  He was working I think in the kitchen

13  at the time that I saw him.

14  Q.    When you had an opportunity to review jail records, did

15  you note anything from the Montgomery County Jail indicating

16  that he had expressed any concerns regarding depression, or

17  anxiety or that the jail itself had noted any depression or

18  anxiety that required medical treatment or prescriptions

19  other than the drug you mentioned earlier?

20  A.    Yeah, he had denied any clinical or neurovegetative

21  episodes.  No hallucinogens or delusions were noted and

22  again they prescribed him Trazodone for sleep in September

23  of 2016.  I think it was the following month then he was

24  cleared to work.

25  Q.    You told us earlier that you categorized it as

1    situational depression.  Is that a normal reaction to the

2    fact that he was incarcerated and facing these particular

3    charges?

4    A.   Yes, in my opinion, yes.

5    Q.   You mentioned just a moment ago that he was cleared to

6    work.  In this particular case, Mr. Walker was incarcerated

7    for a period of time, then cut off his ankle bracelet and

8    absconded for a few months and then was returned to the

9    Montgomery County Jail.  Did you note anything from the

10   Montgomery County Jail records that he had any issues with

11   depression or anxiety when he was then returned to the jail

12   in October of 2017?

13   A.   I don't know.  I don't know if -- I don't have records

14   from that period so I don't know.

15   Q.   As far as the questions related to suicidal ideation,

16   did Mr. Walker indicate to you that there was any attempts

17   that he made towards suicide while he was incarcerated in

18   the Montgomery County Jail?

19   A.   He did not.

20   Q.   Were there any records maintained by Montgomery County

21   Jail that Mr. Walker was on suicide watch?

22   A.   Not that I saw, no.

23   Q.   You indicated that he was cleared to work at the

24   Montgomery County Jail.  Are you aware whether or not he in

25   fact worked at the Montgomery County Jail?

1    A.    Based on his report he did.  What he said is that he

2    was in fact working in the kitchen.

3    Q.    What did he tell you about working in the kitchen, that

4    particular work experience?

5    A.    He said he liked it because it was easy.  If it wasn't

6    easy, he wouldn't be doing it.

7    Q.    When you were talking to Mr. Walker in the course of

8    the 2-hour interview sessions as well as the testing he did

9    later, did you ever observe any depression on his part?

10   A.    No.  So he wasn't crying.  He was appropriately

11   energetic.  He didn't seem lethargic or catatonic.

12   Q.    You didn't observe any panic attacks?

13   A.    No, no.  There were no panic attacks.

14   Q.    Didn't observe any actions on his part that were of

15   concern to you?

16   A.    No.  He didn't present with any psychosis or anything

17   like that.

18   Q.    Finally, the last question or the last area that Mr.

19   Bennett was asking about, you indicated that you believed he

20   fell within the lower end of the average range as far as

21   intellectual function, is that correct?

22   A.    That is correct.

23   Q.    As you testify today, Dr. Marciani, do you have any

24   concerns about his ability to have comprehended what was

25   going on during the plea proceeding in this Court, is there

1   anything about his functioning capabilities that would cause

2   you concern?

3   A.   No, there are no obvious red flags.  He has, you know,

4   appropriate intellectual ability.  He has no history of

5   psychosis.  He in my opinion has no history of other

6   symptoms of a severe mood disorder.

7   Q.   Finally, I apologize.  It is my last question.  The

8   Court asked you about page 11, the offender's account of the

9   offense charged.  The full paragraph 2 when you write, and I

10  quote, "In addition, Mr. Walker stated that he was

11  implicated in a death by fentanyl overdose after somebody he

12  sold drugs to sold drugs to somebody else and that

13  individual then overdosed and died."  Is that correct?

14  A.   Correct.

15  Q.   Mr. Walker did not deny selling drugs, is that correct?

16  A.   No.  What he told me is he was selling heroin.

17          MS. LAFFERTY:  I have no further questions, your

18  Honor.

19          THE COURT:  All right.  Thank you.  Mr. Bennett?

20          MR. BENNETT:  Nothing, your Honor.

21          THE COURT:  All right, doctor, just one followup

22  area.

23          THE WITNESS:  Of course.

24          THE COURT:  If you'd be good enough to turn to

25  page 14.

1          THE WITNESS:  I'll slide over this way so I can

2    face you.

3          THE COURT:  It's page 14, Results of Psychological

4    Testing.

5          THE WITNESS:  Okay.

6          THE COURT:  The MMPI-2 was administered.  Is this

7    a report that is graded or a test that is graded by you or

8    does it have to be sent away for grading?

9          THE WITNESS:  So, there is -- it's kind of a

10   2-step process.  There is a computer program that will score

11   it and plot what essentially is a profile, and then we

12   interpret the profile, if that makes sense.  So it gives us

13   standard scores on different scales and then we interpret

14   the standard scores.

15         THE COURT:  This is not something that has to be

16   sent to the persons who developed the test for scoring?

17         THE WITNESS:  So, they develop the scoring

18   algorithm.  We use their scoring software.

19         THE COURT:  I understand.

20         THE WITNESS:  But we do it inhouse.

21         THE COURT:  I understand.  You indicate that the

22   resultant profile was invalid and not suitable.

23         THE WITNESS:  Correct.

24         THE COURT:  You indicate that he responded to the

25   inventory items in a manner that suggested an attempt to

1   portray himself as being more psychologically disturbed than

2   actually was the case.  Can you give us specific examples?

3          THE WITNESS:  Sure.  So essentially the MMPI is

4   designed with multiple validity scales.  So imbedded in the

5   576 items are items that will tell us if somebody is

6   endorsing symptoms that are unusual and would not be

7   expected to be reported by somebody with a bona fide

8   psychiatric illness.  It also has items, kind of a range

9   from front to back in a way that will let us know if they're

10  responding inconsistently to the item.  So it just helps us

11  get an idea of whether or not we can trust the results.  And

12  essentially he endorsed a lot of items that one would not

13  endorse if you truly had a psychiatric illness.  He

14  basically picked up on, yeah, fell for, those items that are

15  imbedded in there that are designed to detect if somebody is

16  pretending to be more ill than they are.

17         THE COURT:  Hypothetically, like hearing or seeing

18  pink elephants or hearing voices.

19         THE WITNESS:  Right, exactly.

20         THE COURT:  That kind of perception self-reported

21  simply doesn't jibe with what he says are his mental health

22  issues, is that accurate?

23         THE WITNESS:  That's accurate, yes.  They also

24  compare to what a large group of folks with known

25  psychiatric symptoms report about their experience.  The

1    items that folks will endorse if they're trying to look

2    psychiatrically ill won't be items that a huge pool of folks

3    who are known to be ill say that they have experienced.

4            THE COURT:  I understand.  Back to my earlier

5    question, I understand the concept.  Do you have specific

6    examples that you could give?

7            THE WITNESS:  Of the actual item?

8            THE COURT:  Yes.

9            THE WITNESS:  I don't know that I do.  Let me

10   look.  Let me see.

11           THE COURT:  Take your time.

12           THE WITNESS:  Okay.  I have some of them.  I don't

13   have a complete list.  They just kind of break them down by

14   some categories.

15       Like as an example one of the things that he endorsed

16   as being true was the statement:  "Evil spirits possess me

17   at times."  That is an item that folks will endorse if

18   they're trying to look like they are psychotic.

19       "My soul sometimes leaves my body."  He endorsed that

20   as true as well.  That is not, that's not a psychiatric

21   symptom.

22           THE COURT:  Neither is a psychiatric symptom but

23   could it be a colloquialism for something else?  In other

24   words, maybe he's trying to describe a legitimate

25   psychiatric symptom in laymen's terms.

1              THE WITNESS:  Got cha, got cha, got cha.  The best

2      way I can answer that is to tell you that this measure has

3      been normed to a wide range of people.  To your point there

4      could be cultural differences on how folks perceive what is

5      going on within them.  The MMPI-2 has been normed on

6      different populations, not every cultural population that

7      exists by any means but I can tell you it has been normed on

8      folks who are of Caucasian background and African-American

9      and then Hispanic.  Those are the 3 primary.  The idea being

10     that hopefully the test items are validated and written in a

11     way that they would not be biased against, is the best way I

12     can put it, somebody who comes from a particular cultural

13     background.  So the test -- attempts have been made to make

14     sure the test does not give false positives because of that.

15             THE COURT:  I understand.

16             THE WITNESS:  But yes, could it be that somebody

17     is describing things in a way that is abhorrent but not

18     trying to look psychologically impaired, sure, that's

19     possible.

20             THE COURT:  I interrupted you when you were giving

21     examples.  You've given 2.  Do you have a few more because

22     I'm simply looking for examples rather than a complete list.

23             THE WITNESS:  Sure, sure, sure, sure.  Let me --

24     like I said, they don't have them broken down by category in

25     that way.  It will just take me a second.

1          "When I'm with people, I'm bothered by hearing very

2     strange things."  That was endorsed as true.

3          THE COURT:  What -- you have no way of knowing.

4     I'm assuming what he means by that that means he hears

5     voices or does that mean when he's talking to his lawyer, he

6     hears concepts over which he has no -- about which he has

7     no --

8          THE WITNESS:  No understanding.  I don't know what

9     he meant when he endorsed that.  I just can tell you he

10    endorsed it as being true.  He also endorsed, "I see things

11    or animals or people around me that others don't see."

12         THE COURT:  That's the pink elephant.

13         THE WITNESS:  That's the pink elephant.  Thank

14    you.

15         THE COURT:  Mr. Bennett, any followup?

16         MR. BENNETT:  I do have a few followup questions

17    pertaining to the exact issue that you sua sponte asked her

18    about.

19         THE COURT:  Please.

20                    REDIRECT EXAMINATION

21    BY MR. BENNETT:

22    Q.   Doctor, I'm on page 14 also of your report.

23    A.   Okay.

24    Q.   And I'm under Results Of Psychological Testing.

25    Basically what you do, you administer the Minnesota

1    Personality Inventory and you try to get inventory to

2    determine whether or not somebody is accurate in their

3    response or feedback to you, correct?

4    A.    So, we administer it to them because if somebody

5    answers the questions in a consistent and honest way, it can

6    give us information about their personality functioning.

7    Q.    This particular test where you're trying to get the

8    inventory, the profile was invalid, correct?

9    A.    Correct.

10    Q.    If the profile was invalid, it was not suitable for

11    interpretation, correct?

12    A.    Correct.

13    Q.    Explain to Judge Rice how then you go on to make an

14    opinion based on an invalid profile, because that's exactly

15    what you did when you concluded Mr. Walker responded to

16    inventory items in a manner that suggested an attempt to

17    portray himself as being more psychologically disturbed than

18    actually was the case.  So notwithstanding the fact that

19    it's an invalid inventory and it's not suitable for

20    interpretation.

21    A.    Right.

22    Q.    You did just that?

23    A.    It's invalid because of the manner in which he

24    responded to the items.  So when you look at the validity

25    scores, if they're over a certain range because of all of

1    the normative data and the studies they've done on this, you

2    know that if a certain scale is above a certain cut-off

3    point, folks who -- that means that they are endorsing a

4    number of crazy symptoms that are not actual.  So it is

5    invalid because of the manner in which he responded to it.

6    That's what makes it invalid.

7    Q.    If you have an invalid source of information so that

8    you can't interpret the information that was provided, how

9    then can you conclude on an invalid source?

10   A.    So but see, okay.  So there are, like, ten scales that

11   we look at.  And because he approached it trying to make

12   himself look like he was sick, I couldn't tell you what

13   those ten scales say about him.  Okay?  So the validity

14   scales tell me how he approached the measure.  Those are the

15   ones that said to me, hey, okay, he's endorsing everything

16   and anything.  And so because of that, I can't tell you what

17   the clinical scales say about him.  That's what I can't

18   interpret.

19   Q.    You know what secondary gain is, right?

20   A.    Oh, yeah, yeah.

21   Q.    You know what malingering is, right?

22   A.    I absolutely do.

23   Q.    You didn't note secondary gain or malingering

24   throughout this report, did you.

25   A.    No.  He wasn't trying to malinger when we were sitting

1    with him.  He does have secondary gain potentially by making

2    himself look worse off than he was.  I mean, anybody in his

3    situation does.  That's a common thing.

4    Q.    You didn't note secondary gain or malingering in your

5    report, did you?

6    A.    No.  His attempts to make himself look more

7    psychologically disturbed than actually was the case was

8    limited to the MMPI.  In the interview he's telling me:  I

9    don't have any history of stuff, I haven't had a loss of

10   functioning because of mood-related symptoms.  I don't have

11   a history of psychosis.

12   Q.    That was going to be my last question.  I think you've

13   answered it, but I'm going to try to make it clear.  What

14   you're saying is, your conclusion that he was attempting to

15   portray himself more psychologically disturbed than he

16   actually was, that is in fact based on the MMPI, correct?

17   A.    Yeah.

18   Q.    That's not based on anything else?

19   A.    He approached the MMPI in a manner that he attempted to

20   present himself as being more psychologically disturbed than

21   actually was the case.

22   Q.    The report indicates that the MMPI, the resultant

23   profile was invalid and therefore not suitable for

24   interpretation?

25   A.    Right.  I can't tell you anything about the clinical

1   scales, the depression scales, the anxiety scales, psychotic

2   scales, yeah.

3            MR. BENNETT:  Nothing further, your Honor.

4            THE COURT:  Ms. Lafferty.

5            MS. LAFFERTY:  I have nothing else, your Honor,

6   thank you.

7            THE COURT:  All right.  Doctor, give me a moment,

8   if you would.

9            THE WITNESS:  Sure.

10           THE COURT:  Doctor, I hope this won't inject chaos

11  into your schedule but I need to take a five-minute recess

12  to check on something.

13           THE WITNESS:  Oh, no.  I'm fine.  I'm just going

14  to sit here.

15           THE COURT:  We are in recess.

16           (Recess taken at 2:46 p.m.)

17                        IN OPEN COURT

18                         2:55 p.m.

19           THE COURT:  Doctor, I know you're not a

20  pharmacologist so you may well not be able to answer these

21  questions.  Mr. Walker has indicated that he's a long-time

22  substance abuser.

23           THE WITNESS:  Yes.

24           THE COURT:  I think you indicated that in your

25  report --

1          THE WITNESS:  Yes.

2          THE COURT:  -- as well.  As I recall he speaks in

3     terms of marijuana, alcohol, and prescription drug use.

4          THE WITNESS:  Yes.

5          THE COURT:  The prescription drug use is

6     significant.

7          THE WITNESS:  It is.

8          THE COURT:  No dispute on his prior drug use.

9     This offense took place in July of 2016.  I realize at this

10    point Mr. Walker's denying involvement but the offense with

11    which he is charged occurred in July 2016.  He was arrested

12    in early August of 2016.  As far as I can tell, he remained

13    in custody until he entered a plea of guilty on, I believe

14    May 30th of 2017.  So he was in custody for at least ten

15    months.  My question -- or very close to ten months.  My

16    question is, assuming the significant substance abuse with

17    marijuana, alcohol, and prescription medication, what if any

18    effect would that have on his thinking or thought process

19    ten months after the last use?

20         THE WITNESS:  So are you asking if he would still

21    be experiencing any of the effects of those medications ten

22    months after or are you asking more so about the absence of

23    those medications and the effect on his mental state ten

24    months after?

25         THE COURT:  I was asking the former but frankly

1    both are of interest to me.  Would the fact that he's a

2    long-time substance abuser but had not had access to them

3    for a ten-month period of time, would those drugs still have

4    an effect on his thinking process?

5         THE WITNESS:  I would not expect that they would.

6    These are all substances that filter through your body

7    within a few days.  That is not to say that some folks do

8    not experience persisting effects from some substances of

9    abuse.  Alcohol being the most common one.  Like you'll see

10   folks who are chronic alcoholics who drink alcohol in great

11   quantities who experience changes in their brain that are

12   manifested by memory loss.  They will exhibit, though, that

13   behavior after they stop using alcohol.  So if he was having

14   any problems then, I would expect him to exhibit those

15   problems now, if that makes sense.  If those changes occur,

16   they are enduring and persistent.

17        THE COURT:  I understand.  Of the 3 that I've

18   mentioned, alcohol, marijuana, prescription drugs, alcohol

19   is the most significant mind altering of the 3.

20        THE WITNESS:  Correct.  Where we tend to see

21   marijuana having a lasting effect is if somebody becomes --

22   so if somebody has a predisposition to having a psychotic

23   disorder if their genes make them susceptible to

24   schizophrenia, and if they use marijuana, sometimes that

25   will tip them over the edge, and so they'll have psychosis

1    thereafter, that is schizophrenia related but the onset of

2    which was caused by their marijuana use.

3           THE COURT:  I understand.  Thank you.  Follow up,

4    Mr. Bennett?

5           MR. BENNETT:  Nothing, your Honor.

6           THE COURT:  Ms. Lafferty.

7           MS. LAFFERTY:  No, your Honor.  Thank you.

8           THE COURT:  Doctor, as always, thank you for your

9    time.

10          THE WITNESS:  Good to see you.  Thank you for

11   having me.

12          THE COURT:  Appreciate it.

13      I would like to speak with counsel in the conference

14   room with the court reporter but as far as our proceedings

15   in the courtroom are concerned, Ms. Lafferty, anything

16   further?

17          MS. LAFFERTY:  I don't believe so, your Honor,

18   thank you.

19          THE COURT:  Mr. Bennett.

20          MR. BENNETT:  Nothing, your Honor.

21          THE COURT:  All right.  I'll see counsel on an

22   immediate basis.  We are in recess.

23          (Recess taken at 3 p.m.)

24                   IN THE CONFERENCE ROOM

25                        3:02 p.m.

1          THE COURT:  I know where we are procedurally is

2     Clyde has a motion to withdraw his plea.  And, Sheila, I

3     expect you to respond and we're going to need a hearing in

4     open court.  I can't get involved in plea bargaining but I'm

5     just wondering if there has been any talk about disposition

6     of this case without going through the process of a motion

7     to withdraw plea.

8          MS. LAFFERTY:  Judge, as the Court may recall this

9     is an 11(c)(1)(C) where we had agreed 168 to 210 months.  It

10    was agreed that he be let out to assist.  He wasn't holding

11    up his end of the bargain.  Then he absconded.  He had the

12    ability to get down to 120 to 210.

13         It's our position -- I've shared it with Mr. Bennett --

14    that we believe he's in breach of the Plea Agreement.  We

15    allowed him to plea to a 0 to 20 offense as opposed to 20 to

16    life offense.  The guideline calculations would be 292 to

17    365.  It's our intention to not honor the 168 to 210 and to

18    ask for 240 months on this case.  The other option is for us

19    to pull the plea.  I'd rather not do that.  But based on his

20    conduct, again it's our position that he did not honor the

21    Plea Agreement.

22         With that you're certainly, I mean right now it's --

23    the original Plea Agreement is 168 to 210.  Under the terms,

24    and I was looking at it earlier, he has to abide by the

25    conditions of the Plea Agreement and everything under 3E1.1

1    which looks at what he's done post offense and cutting off

2    his bracelet and fleeing and then using the circumstances of

3    when he was caught, I think put him in violation of the Plea

4    Agreement.

5         THE COURT:  What are the circumstances under which

6    he was caught.  I understand he was stopped for a traffic

7    violation.

8         MS. LAFFERTY:  The vehicle in which he was driving

9    came back to a woman who had an active warrant for robbery.

10   There was a female in the passenger's seat.  They attempted

11   to stop the car.  He fled.  It was a high-pursuit chase.

12   Bailed from the car.  They caught him.  When he was arrested

13   he indicated that his name was Tony Bass and immediately

14   gave a Social Security number.  It was not until he was

15   taken to the jail and fingerprinted that they were able to

16   identify him as Cameron Walker and stuff.

17        THE COURT:  I think the best thing to do then is

18   proceed on Clyde's motion, see where that brings us.  It

19   will either bring us to the point where plea bargaining can

20   begin again, culminating in a trial if necessary or if the

21   plea is maintained, I may ask you to go back and talk about

22   an alternative sentencing range.  But I don't see any point

23   at this juncture, particularly since I can't play an active

24   role in going any direction other than following through on

25   the motion to withdraw.

1        MS. LAFFERTY:  Judge, the problem that has become

2   is now he has submitted an affidavit to the Court that he

3   signed indicating that he did not do the conduct for which

4   we charged him with which again goes back to his assistance

5   and truthfully admitting the conduct which means if we were

6   even to use him down the road as a witness he's now said, "I

7   didn't do it" under oath.

8        THE COURT:  I understand.

9        MS. LAFFERTY:  It continues to get more

10  complicated.  We were really trying to help him out early

11  on.

12       THE COURT:  I do understand.  I don't know

13  anything to do, Clyde, other than wait till Sheila files her

14  response in good time.  Maybe the best thing to do before

15  you leave is to set a date for a hearing on your motion.

16       MS. LAFFERTY:  Does the Court want the government

17  to file a motion opposing it before the hearing or in

18  response to the hearing?

19       THE COURT:  Let's do it in response to the

20  hearing.  We'll give Clyde a shot at filing a memorandum as

21  well.

22     Don't go anywhere.  Give me a minute.

23     How old is he, Clyde?

24       MR. BENNETT:  He's 23, Judge.

25       THE COURT:  Quite apart from legal culpability

1    whether this gentleman did what he is accused of doing,

2    23-year-old kid, I don't want to blame things on the system,

3    whatever we're doing to help young people isn't working.

4    We're just throwing away generations after generations.

5    Sheila, I'm not telling you anything you don't already know.

6            THE COURTROOM DEPUTY CLERK:  Thursday, March 29th

7    at 9:30 after Judges' meeting.

8            THE COURT:  Let's do it the morning of the 6th of

9    April 9 a.m.  Sheila, hold off any memorandum until we have

10   the hearing.  Thank you.  It's a motion to withdraw plea of

11   guilty hearing.  Sheila, anything else?

12           MS. LAFFERTY:  I don't believe so, your Honor.

13           THE COURT:  Clyde.

14           MR. BENNETT:  Nothing, your Honor.

15           MS. LAFFERTY:  Two cells are in our possession.  I

16   sent it to Clyde and asked which one belonged to the wife

17   because we're still hoping that he has information to help

18   us.  There's contact information on the phone.  We'd like to

19   keep it as evidence.  If she can indicate which phone is

20   hers.

21           MR. BENNETT:  One is pink.

22           MS. LAFFERTY:  I don't know what stuff it has on

23   it.  If she wants to come over and do something with it.

24           THE COURT:  No jewelry.

25           MS. LAFFERTY:  We didn't take any into possession.

1    Whatever he had was turned over to the jail as jail

2    property.

3              THE COURT:  What would the jail do with it?

4              MR. BENNETT:  I think the jail would give it back.

5    I don't think there's anything the Court can do if in fact

6    she had jewelry taken by the jail.

7              THE COURT:  Why don't I do this.  Why don't I ask

8    Tish to call the jail and see if they have it.  I'll give

9    you a call.  Then you can contact your client.  Do you have

10   any idea of when he was arrested?  I can find that out in 2

11   minutes.

12             MR. BENNETT:  I don't know off the top of my head.

13             THE COURT:  I also, as I recall, owe him

14   consideration of lowering his 12-year sentence based on

15   police reports and one other thing.  The police reports I

16   have.

17             MS. LAFFERTY:  I thought I sent them both to the

18   Court and to Mr. Bennett.

19             THE COURT:  You sent them to me.

20             MS. LAFFERTY:  I know I sent them to the Court.  I

21   also sent them to Mr. Bennett.  He asked me about that.

22   I'll double-check my emails.  If I didn't, I have to remove

23   personal identifying information.  The police reports are

24   inconsistent with what she said to the Court.

25             MR. BENNETT:  For the record I don't want to throw

1   my client under the bus.  I think this needs to be part of

2   the record.  She was before your Honor and the issue with

3   respect to additional limited consideration that you would

4   consider was whether or not his providing substantial

5   assistance and cooperation to get the K5 whether or not he

6   endangered his family and whether or not they were going to

7   attack his family.  The wife said there was.  She has police

8   reports to document the fact that the family was victimized

9   after he gave consideration for the 5K.  In fact the reports

10  don't indicate that.  They indicate that there was something

11  other than somebody retaliating, giving rise to what

12  happened to the family.  I'm not going to be going forward

13  with anything as far as reconsideration as far as the filing

14  of anything.  I don't think I can do that in good faith.

15          THE COURT:  Clyde, I appreciate that.  There was

16  another loose end.

17          MS. LAFFERTY:  There was the Cleveland Clinic

18  records.

19          THE COURT:  Whether she had congestive heart

20  failure.  I have those records.

21          MS. LAFFERTY:  The Court has them?

22          THE COURT:  I don't know where they came from.

23  I'll tell you where I got them.  His wife dropped them off.

24          MS. LAFFERTY:  Then I haven't seen them.

25          THE COURT:  I'll send them to you.

1          MR. BENNETT:  I would like to see those.

2          THE COURT:  You've got them.  We'll check on the

3    jewelry.  Thank you both.

4          (Proceedings concluded at 3:19 p.m.)

5                      - - -

6                    CERTIFICATE

7          I, Debra Lynn Futrell, Federal Official Court

8    Reporter, in and for the United States District Court for

9    the Southern District of Ohio, Western Division at Dayton,

10   do hereby certify that the foregoing pages constitute a true

11   and correct transcript of the stenographically reported

12   proceedings held in the above-entitled matter, on the date

13   indicated, to the best of my ability and knowledge,

14   transcribed by me.

15

16   s/Debra Lynn Futrell,

17   Debra Lynn Futrell
     Federal Official Court Reporter
18

19

20

21

22

23

24

25