1          IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF OHIO
2              WESTERN DIVISION AT DAYTON

3    UNITED STATES OF AMERICA,

4                    Plaintiff,

5        Vs.                    CASE NO. 3:17-cr-83

6    CAMERON A. WALKER,

7                    Defendant.

8
                TRANSCRIPT OF PROCEEDINGS
9
       ORAL AND EVIDENTIARY HEARING ON DEFENDANT'S MOTION TO
10                       WITHDRAW PLEA

11   PRESIDING:  THE HONORABLE WALTER H. RICE

12   DATE:  Friday, April 6, 2018

13   APPEARANCES:

14   For The Plaintiff:

15   BENJAMIN C. GLASSMAN
     United States Attorney
16   By: Sheila G. Lafferty, Esq.
         Assistant United States Attorney
17       200 West Second Street, Suite 600
         Dayton, Ohio  45402
18       (937) 225-2910
         Sheila.lafferty@usdoj.gov
19
     For The Defendant:
20
     By: Clyde Bennett, II, Esq.
21       119 E. Court Street
         Cincinnati, Ohio  45202-1203
22       (513) 632-9503
         Clyde@clydebennettthelaw.com
23

24   Also Present:  Jennifer Wright, U.S. Probation Officer

25

```
 1    Court Reporter:  Debra Lynn Futrell, CRR
                       Federal Building
 2                     200 West Second Street
                       Dayton, OH  45402
 3                     (937) 512-1511
                       Debra_Futrell@ohsd.uscourts.gov
 4
        Proceedings recorded by mechanical stenography, transcript
 5                        produced by computer

 6                              - - -

 7                              INDEX

 8                      D    X    RD

 9    Cynthia Hopkins   8   24    46

10                              - - -

11                      Friday, April 6, 2018

12                    IN THE CONFERENCE ROOM

13                          9:04 a.m.
```

14         THE COURT:  This is CR-3-17-83, *United States*

15  *versus Cameron Walker.*  Sheila Lafferty for the government.

16  Clyde Bennett for the Defendant.

17      We're here for an oral and evidentiary hearing on the

18  Defendant's motion to withdraw his guilty plea.

19      Clyde, I look to you to go forward.  Whom will you have

20  as witnesses?

21         MR. BENNETT:  The Defendant and his mother.

22  That's it, Judge.  No exhibits.

23         THE COURT:  No exhibits?

24         MR. BENNETT:  No exhibits, your Honor.

25         THE COURT:  Sheila, how about you?

1          MS. LAFFERTY:  Judge, we don't have any witnesses.

2    The only exhibit I have I requested a copy of the plea

3    colloquy.

4          THE COURT:  Which I have.

5          MS. LAFFERTY:  Which the Court has.

6          THE COURT:  Without putting the details on the

7    record, have you discussed with Sheila the nature of plea

8    bargaining?  Clyde, you're too good a lawyer to need my

9    advice.  I'm not going to give you any.

10          MR. BENNETT:  I'll take your advice, Judge.

11          THE COURT:  But your client shortly is going to

12    take the witness stand and admit he lied under oath when the

13    plea was taken.  I don't know what Sheila, if anything, is

14    willing to offer.  It might be good if the 3 of us left,

15    Jacob, Mary Grace and myself, and you chat with her to see

16    if there's any way that this matter can be resolved.

17          MR. BENNETT:  I would take advantage of that

18    opportunity to do that, Judge.

19          THE COURT:  Jacob, Mary Grace, we'll see you in

20    the courtroom.

21      Simply let Tish know if you get anywhere and you want

22    to talk to me.  Just let Tish know once you've exhausted

23    discussions if not successful.  Tell her, Sheila, to buzz

24    me.  The two of you are welcome to remain in here.

25          (Recess taken at 9:07 a.m.)

```
 1                    IN THE CONFERENCE ROOM

 2                         9:22 a.m.

 3            THE COURT:  Who wants to talk first?  Sheila.

 4            MS. LAFFERTY:  Judge, Clyde and I have had these

 5    discussions before.  The original Plea Agreement was 165 to

 6    210 under an 11(c)(1)(C).  I've said before, based on what

 7    happened, that the United States was not going to stand on

 8    the 11(c)(1)(C).  In looking back at that, your Honor, that

 9    at least gets a period of time that, because part of our

10    plea negotiations were that we allowed him to plead to up to

11    a 20-year offense as opposed to the minimum mandatory 20.

12    So at this point in time if he wants to still stand by the

13    165 to 210 we will honor that.  If he wants to withdraw his

14    plea, the offense is no longer up to 20 offense but it's a

15    20-to-life offense.  I think under the circumstances the

16    range that he's been given is fair and the numbers are

17    significantly higher when scored out if he doesn't want to

18    go with this particular guideline range.

19            THE COURT:  How do you mean the numbers are higher

20    if scored out?

21            MS. LAFFERTY:  He loses acceptance of

22    responsibility for, I think he did an affidavit in here if

23    I'm not mistaken.

24            MR. BENNETT:  He already lost acceptance of

25    responsibility.
```

1          MS. LAFFERTY:  Acceptance is off.  You can factor

2     in obstruction of justice.  We had originally told him when

3     he failed to show for sentencing our intention was to file

4     additional charges for him failing but because that court

5     appearance was taken off the docket, there wasn't a court

6     appearance for him to go to so we weren't able to file that

7     additional charge.  Had we been able to do that, his numbers

8     would be significantly higher.  I told Clyde earlier that

9     the range is 168 to 210.  He's certainly probably going to

10    argue for 168.  We're going to argue at the other end based

11    on everything that's happened and the action in the case.  I

12    explained to him that in the back of the courtroom is the

13    mother of the victim.  She was here when he pled.  She was

14    here when we were last in court.  She's seen him take

15    responsibility for causing the death.  Now he's going to

16    come in today and say he didn't cause the death.  So she's

17    going to come back in the next time when the next matter

18    happens.  I think he's doing more harm to the family in this

19    case.

20          THE COURT:  All right.  Clyde, tell me your

21    thoughts.  Again, I wish this were state court where I could

22    get involved but I can't.

23          MR. BENNETT:  I understand, Judge.

24          THE COURT:  You have several options.  Number 1,

25    to say no, let's go forward, and that's great.  Number 2, go

1    forward and reserve a decision or chat with your client and

2    take some time to let him think.  Whatever you suggest,

3    we'll do.

4              MR. BENNETT:  Judge, I want to go forward.  I'm

5    not going to put the Defendant on the stand but I'm going to

6    put his mother on the stand.  Then the Court can make a

7    decision.  I think she's going to stand on the Plea

8    Agreement; the 11(c)(1)(C).  He'll get 168 to 210 months if

9    the plea is not withdrawn.

10             THE COURT:  I understand.  You're going to put his

11   mom on the stand and basically rest your case.

12             MR. BENNETT:  That's it, Judge.

13             THE COURT:  Okay.

14             MR. BENNETT:  That's it.  I don't have any

15   exhibits and let your Honor make a decision.  Based on what

16   I know of your colloquys, my experience with them and my

17   experience with this case, I think the plea is not going to

18   be withdrawn.  Then we'll have that 11(c)(1)(C) plea before

19   you.  At the end of the day, I've got a family who knowingly

20   they want due process.  I'm not going to give them due

21   process to the extent they're going to jeopardize my client

22   anymore.  I'm going to give them as much due process as I

23   can.

24             THE COURT:  That's no problem.  I want to make

25   certain of one thing.  Again I don't think this is forbidden

1    plea bargaining.  If we go forward today with just the

2    Defendant's mother, does your offer still stand?  Do you

3    want a minute to think about it?

4              MS. LAFFERTY:  Judge, I will tell you as I

5    explained to Mr. Bennett because the victim's mother is

6    here, if his mother is going to take the stand and proclaim

7    her son's innocence to this, I mean the offer is still going

8    to stand, Judge, at 168 to 210.  I think again it's going to

9    reinforce why the government is to ask for 210 and make as

10   solid a record as we can.

11             MR. BENNETT:  That was my understanding.

12             THE COURT:  Fair enough.  I'll see you out in the

13   courtroom.  Thank you.

14             (Recess taken at 9:28 a.m.)

15                      IN OPEN COURT

16                       9:32 a.m.

17             THE COURT:  We have this morning case CR-3-17-83,

18   *United States of America versus Cameron Walker.*  Mr. Walker

19   is in open court with counsel, Mr. Clyde Bennett.  The

20   government is present in the person of Assistant United

21   States Attorney, Ms. Sheila Lafferty.  Ms. Jennifer Wright,

22   United States Probation Officer, is present as well.

23       We are here for an oral and evidentiary hearing on the

24   Defendant's motion to withdraw guilty plea filed at document

25   number 23.

1          Mr. Bennett, I understand you have a witness you wish

2    to call.

3               MR. BENNETT:  Cynthia Hopkins, your Honor.

4                     CYNTHIA HOPKINS,

5               after having been first duly sworn,

6                    testified as follows:

7               THE COURT:  Proceed if you would, Mr. Bennett.

8               MR. BENNETT:  Thank you, your Honor.

9                    DIRECT EXAMINATION

10   BY MR. BENNETT:

11   Q.   Good morning, Ms. Hopkins.

12   A.   Good morning.

13   Q.   Can you state your full name for the record?

14   A.   Cynthia Hopkins.

15   Q.   How are you related to Cameron Walker?

16   A.   I'm his mother.

17   Q.   You're aware of Cameron's legal predicament, correct?

18   A.   Yes.

19   Q.   You know about this case, correct?

20   A.   Yes.

21   Q.   When I say "this case," the case that you're testifying

22   in now?

23   A.   Yes.

24   Q.   The federal case against your son?

25   A.   Yes.

1    Q.   How do you know about Cameron's case and his

2    involvement in this case?

3    A.   Excuse me?

4    Q.   How do you know about this case?  How did you get

5    information about Cameron's case?

6    A.   Just from the lawyer and basically speaking with

7    Cameron.

8    Q.   You speak with Cameron pretty often, correct?

9    A.   Yes, every day.

10   Q.   You've been speaking with Cameron every day since he

11   was charged for this federal offense, correct?

12   A.   Yes.

13   Q.   How do you talk to him?

14   A.   Like a mother.

15   Q.   What manner or mode or method is used for you to

16   communicate with your son?

17   A.   I just try to tell him to remain positive, keep your

18   head up.

19   Q.   That was a question by me.  How are you able to talk to

20   him by phone?  Do you visit him also?

21   A.   By phone.  I visit him a few times but mostly by phone.

22   Q.   You're telling the Judge you basically talk to him on

23   the phone every day?

24   A.   Every day.

25   Q.   You were talking to him on the phone every day before

1    he entered a plea in this case?

2    A.    Yes.

3    Q.    When you would talk to him, what would you talk about?

4    A.    We just mainly talk about the issue, his kid, the way

5    he was feeling.

6    Q.    Would you talk about the case also?

7    A.    A little, yes.

8    Q.    Was this the first time your son had faced a

9    significant amount of prison time --

10   A.    Yes.

11   Q.    -- in his life?

12   A.    Yes.

13   Q.    Tell me about your son's performance in school.  Let's

14   talk about elementary school and junior high.

15   A.    Okay.  I had to always stand behind him and push him

16   the whole way.

17   Q.    What I'm getting at, I'm getting at his intelligence or

18   his intellectual capacity.  That's what I'm asking you

19   about.  How did he perform in high school?

20   A.    He barely made it through but he made it.

21   Q.    Did he have a learning disability?

22   A.    I'm not going to say it was a disability but he didn't

23   seem to grasp things and it was a push.

24   Q.    When you say he didn't seem to grasp things, like what

25   type of things are you talking about?

1    A.    Just understanding things.

2    Q.    Understanding concepts?

3    A.    Understanding concepts.

4    Q.    Do you know whether or not he's had any difficulty

5    focussing throughout his years?

6    A.    Yes.  He's always had difficulty focussing.

7    Q.    Spell that out a little bit.  Explain to the Judge why

8    you believe that he's had difficulty focussing throughout

9    his life.

10    A.    Because you can have a conversation with Cameron and

11    you can just lose him right in the conversation.  He's the

12    type of child that you could say, "Cameron" -- I'm just

13    going to use an example -- "go upstairs and get me a book

14    and also get my purse."  He'll go upstairs but he won't come

15    down with what I asked him to get.  I didn't understand what

16    was going on with that.  But it was always like that.  He

17    was never organized, ever.

18    Q.    That sample you gave, is that an example of him not

19    being able to focus on the issue of something that was

20    presented to him?

21    A.    Right.

22    Q.    Him not being able to follow it or focus on it?

23    A.    Correct.

24    Q.    Is that the only occasion or are there other occasions

25    and that was only one example?

1    A.    There's a lot of examples.

2    Q.    You don't have to give me the other examples.

3    A.    Okay.

4    Q.    Let's talk about depression.  Has your son ever

5    experienced depression?

6    A.    Yes, he has.

7    Q.    Tell us about that.

8    A.    Okay.  He experienced depression like 3 years ago

9    really bad where he was talking about not wanting to be

10   here.  I assured him, "Cameron, you need to be here because

11   I love you.  Your family loves you.  You just can't give

12   up."

13   Q.    What were some of the symptoms of depression besides

14   suicidal ideology?  Was there any other depression?  How did

15   it manifest?  What did he do or what did he say as a result

16   of being depressed?

17   A.    Well, first of all, he had started taking drugs.

18   Q.    Uh-huh (affirmative response).

19   A.    And then he would just, I didn't know why he would

20   choose that route but he would just cry and just be

21   depressed.  I didn't really understand it because I never

22   dealt with somebody depressed but it was a trying time for

23   me and him.

24   Q.    Was this before the inception of this particular

25   criminal charge?

1    A.    Yes.

2    Q.    Or afterwards?

3    A.    Before.  It was before.

4    Q.    Before this case?

5    A.    Before this case, my son was depressed.

6    Q.    He was also involved in the consumption of drugs you

7    say?

8    A.    Yes, he was.

9    Q.    What drugs?

10   A.    As far as I know, it was marijuana, alcohol, and Xanax

11   and Percocets.  Prescription drugs.  Alcohol and marijuana.

12   Q.    You talked about depression and his ability to focus.

13   Based on being around your son all of his life, how does he

14   handle stressful life events?

15   A.    He doesn't handle them too well.  Cameron's the type of

16   child where I had to do mostly everything for him.  For

17   example, I had to tie his shoes till he was about 8 years

18   old.  Just help him through things and wipe his nose till he

19   was about 9 years old.  He just seemed to be behind.  He

20   would have a house key that he would lose every time I gave

21   it to him.  He just didn't seem focussed to me.  And the

22   teachers would say he's here but he's just not quite here

23   because he did have a, they have a school counsellor that he

24   will go talk to.

25   Q.    Would you consider his intellectual functioning -- as a

1    parent, a mother, would you consider his intellectual

2    functioning average or below average?

3    A.    I would say it's below.

4    Q.    We've talked about him historically.  We talked about

5    him as a child and as a teenager.  What about a 22-year-old

6    man back in 2016, I mean, how was his intellectual

7    functioning then?

8    A.    It was still the same.  It was the same.  He was acting

9    as Cameron as he always did.  I always had to stand behind

10    him, push him.

11    Q.    When he was charged with this federal case, I think you

12    said earlier that you was talking to him practically on a

13    daily basis?

14    A.    Yes.

15    Q.    Every day about the case and some other things

16    telephonically, correct?

17    A.    Yes.

18    Q.    Did you have conversations with him regarding the Plea

19    Agreement that he actually signed?

20    A.    Yes.

21    Q.    What did he say about the Plea Agreement?

22    A.    He didn't really understand it but the reason.

23    Q.    Let me stop you right there.

24    A.    Okay.

25    Q.    When you say "the Plea Agreement," you're talking about

1    the Plea Agreement that stands before the Court now.  I want

2    to make sure we're clear for the record what we're talking

3    about.

4    A.    Yes.

5    Q.    Where he's agreed to do a certain number of years?

6    A.    Right.

7    Q.    I think it's 14 years up to 17-1/2 years?

8    A.    Yes.

9    Q.    That was done with his previous lawyer?

10   A.    Yes.

11   Q.    My predecessor, Attorney John Rion?

12   A.    Yes.

13   Q.    That's the Plea Agreement you're talking about?

14   A.    Yes.

15   Q.    The Plea Agreement that was done probably back in maybe

16   August of 2017, does that sound about right or the summer of

17   2017 maybe?

18   A.    No.  The Plea Agreement was like June 2017.

19   Q.    Okay.  June 2017.  You're correct.

20   A.    Yes.

21   Q.    I think you said he didn't understand it.  Did you make

22   that statement?

23   A.    Yes.

24   Q.    Tell Judge Rice why you think your son didn't

25   understand that Plea Agreement.

1    A.    I don't think he had a chance to really understand it

2    because it was presented to him one hour before he stood

3    before the Judge.  One hour.

4    Q.    You're saying that the Plea Agreement was presented to

5    your son one hour before he came into this courtroom?

6    A.    Yes.

7    Q.    How do you know that?

8    A.    Because like I said I talk to Cameron every day.  He

9    was calling me on the day that he was going to be in court.

10   You know, asking, "Where is the lawyer?"  Has he been -- I

11   mean, is he going to come with the agreement?

12         I'm, like, I don't know.  So that's how I knew that he

13   didn't have that agreement.

14   Q.    What day did you last talk to him before he actually

15   entered the Plea Agreement?  Do you understand my question?

16   A.    Yes.  I talked to him on that day, that he stood in

17   here and entered the Plea Agreement.

18   Q.    Were you here when he entered --

19   A.    Yes, I was.

20   Q.    -- the Plea Agreement?

21   A.    Yes, I was.

22   Q.    Because that was the Court date that had already been

23   previously scheduled, correct?

24   A.    Yes.

25   Q.    Did you talk to him before, the night before, did you

1    talk to Cameron on the phone the night before?

2    A.    Yes, I did.

3    Q.    Had he had the Plea Agreement in his possession --

4    A.    No.

5    Q.    -- the night before?

6    A.    No.

7    Q.    So when did you learn that he was presented with the

8    Plea Agreement?  Did you learn that in court or did you

9    learn that when you talked to him later on that day?

10   A.    I learned that in court because I had talked to him

11   like right before he came to court.  Not too long before he

12   came to court.

13   Q.    That's the question I'm trying to clarify for your

14   Honor.  So you spoke to him the morning of the court date?

15   A.    Yes.

16   Q.    You spoke to him telephonically, correct?

17   A.    Yes.

18   Q.    That's when he told you about the Plea Agreement?

19   A.    Yes.

20   Q.    That was, like, hours before court?

21   A.    Hour before court.

22   Q.    You're saying you spoke to him an hour before court and

23   he told you he had just gotten the Plea Agreement?

24   A.    I'm not saying it was quite an hour I talked to him.  I

25   know I talked to him shortly before court and he had not

1    received a Plea Agreement.

2    Q.    And you also said he didn't understand it and one of

3    the things you said you base that on was the fact he got

4    the, he received the Plea Agreement one hour --

5    A.    Right.

6    Q.    -- before he entered the plea?

7    A.    Right.

8    Q.    Is there any other reasons that led you to believe he

9    didn't understand the Plea Agreement?

10   A.    Because --

11   Q.    Anything he said?

12   A.    I don't think he knew the legal jargon in the Plea

13   Agreement, first of all.  I didn't think, to be honest, he's

14   intelligent enough to understand what was really going on.

15   I just think he entered it not knowing.

16   Q.    Besides the legal jargon and the fact that he got it an

17   hour before, did he say or do anything, talking about your

18   son Mr. Walker, did he say or do anything that would make

19   you believe that he really doesn't understand what he's

20   doing?

21   A.    I didn't think --

22   Q.    Did he say or do anything to indicate he didn't

23   understand what he was doing; your son?

24   A.    Right.  I didn't think he understood because he didn't

25   have it, first of all.  And I just felt like it needed to be

1   presented to him way before so it can be, you know, his

2   lawyer went over it with him page by page to make him

3   understand because there was things in there that almost

4   made me stand up in court.

5   Q.   Let me ask you this.  Did he tell you he understood the

6   Plea Agreement or did he say --

7   A.   No.

8   Q.   Or did he say he didn't understand the Plea Agreement?

9   A.   He told me he didn't understand.  As a matter of fact

10  when he got home, he told me, "Mom, I really didn't

11  understand that Plea Agreement but they said I can come

12  home."

13  Q.   When did you have this conversation when he said, "you

14  know what?  I don't understand the Plea Agreement or didn't

15  understand the Plea Agreement but I wanted to come home,"

16  where was that conversation held?

17  A.   That conversation was held when I picked him up from

18  the courts.

19  Q.   When he was being released?

20  A.   When he was being released.  On the way home.  He did

21  not understand it.

22  Q.   Was that the same day that he was in court or a

23  different day?

24  A.   No, I think it was a different day.  But I talked to

25  him every day.  He said he didn't understand it but he

1    wanted to come home because he had been incarcerated for

2    nine months.  This is the first time he ever been in

3    trouble, in jail that long at all.  So he was just -- I

4    believe he done it too quickly, didn't understand it on the

5    hopes to come home.

6    Q.   You keep telling me what you think.  I appreciate that

7    because I asked you about what you thought.  Now, I'm asking

8    you a different question to touch on a little bit.  I want

9    to be clear.  I want you to tell me what he said as far as

10   understanding.  Are you telling me everything he, Mr. Walker

11   said about the Plea Agreement?

12   A.   He said, "mom, I didn't understand the Plea Agreement."

13   He didn't understand it.  "But they was saying I could come

14   home."

15   Q.   When he said "they," who was he referring to?

16   A.   Rion.  Rion said he could come home if he signed the

17   Plea Agreement.

18   Q.   In fact he came home a couple days, a day or 2 later,

19   correct?

20   A.   Yes, he did.

21   Q.   You were here during the Plea Agreement.  Correct?

22   A.   Yes.

23   Q.   Judge Rice is very, very thorough about his Plea

24   Agreement.  Probably more thorough than any other Judge?

25   A.   Uh-huh (affirmative response).

1    Q.    You were here that day when Judge Rice had the colloquy

2    or exchange when he was asking questions about the Plea

3    Agreement?

4    A.    Yes, I was here.

5    Q.    Notwithstanding the thoroughness of Judge Rice, do you

6    think your son -- based on your observations of him and

7    communications with him later, do you think he understood

8    what was going on?

9    A.    No.

10    Q.    Why not?

11    A.    Because I don't think he ever would have signed a Plea

12    Agreement that stated the things it stated.  I just don't

13    believe he would have signed it because he always told me

14    about his innocence upon that particular day.  So I know he

15    didn't -- I feel like he did not understand it.  He told me

16    he did not understand it.  If it was me, he never would have

17    signed it.

18    Q.    Explain to me and Judge Rice how he could sit up in a

19    courtroom, in this particular courtroom for about an hour,

20    45 minutes to an hour?

21    A.    Uh-huh (affirmative response).

22    Q.    And be constantly reminded and told what he was doing,

23    be constantly reminded and told about the consequences of

24    what he was doing by Judge Rice because that's what Judge

25    Rice does and still not know and understand what he was

1   doing?

2   A.   He's very immature, first of all.  Very immature.

3   Young adult.  Don't understand anything about the legal

4   system.  Has never been in this situation.  Didn't

5   understand the seriousness of what he was signing.

6   Q.   Explain to Judge Rice how he could actually verbally

7   state that he understood what was going on in response to a

8   question by the Court but not understand what was going on?

9   A.   Excuse me?  Can you repeat that?

10  Q.   Explain to Judge Rice how your son could stand before

11  the Judge with his lawyer and be asked a question about

12  whether or not he understood something and affirmatively

13  say, "yes, I understand it," when in fact he doesn't?  Do

14  you understand my question now?

15  A.   No, I don't.

16  Q.   Here's what you're saying.  I'm not picking on you but

17  I want to be clear on what's going on here.

18  A.   Okay.

19  Q.   You're telling me and Judge Rice today that he didn't

20  understand what he was doing.  He didn't understand the

21  consequences of the Plea Agreement, correct?

22  A.   Correct.

23  Q.   He just didn't understand it?

24  A.   Correct.

25  Q.   He told you later on, "I didn't understand the Plea

1    Agreement, I was just trying to get out."

2    A.    Yes.

3    Q.    My question for you is this.  How could he not

4    understand the Plea Agreement when he stood before Judge

5    Rice for 45 minutes to an hour and Judge Rice repeatedly

6    asked him "do you understand what you're doing," and he said

7    yes?

8    A.    Because I think Cameron blocked it out.  Cameron wanted

9    to come home.  He wanted to be released after being locked

10   up so long and he's never been locked up before.  He's never

11   been in trouble.  He does not understand the legal system.

12   He does not understand the consequences to signing that Plea

13   Agreement.

14   Q.    You think in part that may be due to his immaturity and

15   some of his, I hate to say psychiatric issues, but

16   developmental issues?

17   A.    Yes.

18   Q.    What was your -- based on your conversations with Mr.

19   Walker, what was your understanding of the Plea Agreement?

20   A.    What I understand is they offered him a certain amount

21   of years but he would get 10 years.  That was my

22   understanding.

23   Q.    What was your son's understanding of what would happen

24   after he signed the Plea Agreement and he was in court with

25   Judge Rice, what did he understand, if anything, about how

1    much time he would get, if any?

2    A.    I can't really say what he actually thought he would

3    get.

4            MR. BENNETT:  No further questions, Judge.

5            THE COURT:  All right.  Thank you, Mr. Bennett.

6    Ms. Lafferty on cross.

7            MS. LAFFERTY:  Thank you, your Honor.

8                    CROSS-EXAMINATION

9    BY MS. LAFFERTY:

10   Q.    Good morning, ma'am.

11   A.    Good morning.

12   Q.    So, let's back up for just a bit.  Your son was

13   arrested in August of 2016, is that correct?

14   A.    Yes.

15   Q.    At that time he was represented by Mr. Rion's office?

16   A.    Yes.

17   Q.    Did you pay for the services of Mr. Rion?

18   A.    Yes.

19   Q.    So you retained him for your son?

20   A.    Yes.

21   Q.    Had you used Mr. Rion's office before?

22   A.    No.

23   Q.    Did you have any difficulty with Mr. Rion?

24   A.    It was hard to talk to him.

25   Q.    Did you speak with both John Rion and Jon Paul Rion?

1    A.    I spoke to Jon Paul Rion, the son.

2    Q.    Because you retained them, I'm assuming in August of

3    2016?

4    A.    Uh-huh (affirmative response).

5    Q.    You maintained contact with them August, September,

6    October, November, December of 2016?

7    A.    Uh-huh (affirmative response).

8    Q.    And then January, February, March, April, and May of

9    2017?

10   A.    Probably.  I was on him, yes.

11   Q.    You were on him?

12   A.    Yes.

13   Q.    You paid for his services.  And your son entered a plea

14   on May 30th of 2017.  Were you in court the day your son

15   entered a plea?

16   A.    Yes.

17   Q.    Do you recall who was here on behalf of Mr. Rion's

18   office?

19   A.    Yes.  It was senior and junior.

20   Q.    Both were here?

21   A.    Both were here.

22   Q.    Not only did you get one person from the office, you

23   had both John Rion, the father, and his son, Jon Paul Rion?

24   A.    Yes.  I didn't understand why the father was here

25   because he didn't have anything -- I never really talked to

1    him and seen him.  Didn't know he knew about the case.

2    Q.    But not only did you have one attorney you had 2

3    attorneys from that office, correct?

4    A.    2 attorneys.

5    Q.    Both sat at counsel table, correct?

6    A.    I believe so.

7    Q.    And you, as you were sitting in the courtroom, heard

8    the entire plea colloquy, everything that occurred on the

9    record in this courtroom?

10   A.    Yes, I heard it.

11   Q.    So when Mr. Bennett just asked you that you -- there

12   were things about the Plea Agreement that you didn't

13   understand and when you left the courtroom your

14   understanding was that your son was going to receive a

15   10-year sentence, is that correct?

16   A.    Yes.  He could receive one.

17   Q.    What was your understanding that day?  What did you

18   hear on the record as to the sentence that your son was

19   facing?

20   A.    Excuse me?

21   Q.    What was your understanding as you testify today as to

22   what sentence your son was facing?

23   A.    I believe it was, like, 13 years or something but you

24   can get 10 years.  If you do certain things, you can get 10

25   years.

1    Q.    Do you recall the Court advising your son that this

2    particular Plea Agreement was a binding 11(c)(1)(C) Plea

3    Agreement with a range of 168 to 210 months or 14 years to

4    17 years, 6 months?  Does that sound familiar to you?

5    A.    I mean, it sounds familiar.  I'm not going to say it

6    sound familiar in court because I can't really tell you what

7    the actual years was, but after, after I seen it and, you

8    know, I understood it after I seen it, but I can't tell you

9    what it was actually in court, the months exactly.

10   Q.    I'll read from the transcript.  The Court:  Then I put

11   those 2 point totals, I look at the law.  I apply these 2

12   very different point totals and I come up with a sentencing

13   range that is one I have to consider but which I'm not

14   necessarily obligated to file which in your case is 168 to

15   210 months.  Anywhere from 14 years to 17 years, 6 months.

16   Do you understand?  Your son replied, "Yes, sir."

17   A.    Okay.  He probably did reply "yes, sir," and the reason

18   is, he wanted to go home.

19   Q.    You don't have any -- there's no difficulty in

20   understanding that that particular range is 14 years to 17

21   years, 6 months?

22   A.    There's no difficulty for who?

23   Q.    You didn't have any difficulty understanding that, that

24   that was the range he was looking at?

25   A.    Like I said, I'm not sure what the range actually was.

1    I wasn't happy with it at all.  I mean.

2    Q.   Let me ask you that.  You sat through the entire plea.

3    At any point in time did you stand up and say, "no, my son

4    is not pleading"?

5    A.   No, I didn't but I made a lot of noise; a lot of grunts

6    and everything, but I did not stand up.  Thinking back, if I

7    could -- I didn't think I was allowed to stand up but if I

8    could have stood up, I most definitely would have.

9    Q.   Your son entered a plea on May 30th, 2017.  Following

10   the plea, did you contact Mr. Rion's office and profess your

11   son's innocence or make claims that "this is not what he

12   wanted to plead to"?

13   A.   I've always told Mr. Rion this.

14   Q.   Did you tell it to him following the plea on May 30th?

15   A.   I don't know if I did on that particular day.

16   Q.   On May 31st did you contact his office and complain

17   about it?

18   A.   I cannot tell you when I contacted Rion's office.  I've

19   always had run-ins with Rion.  I never really agreed with

20   Rion's strategies.  Never did.

21   Q.   You hired him for your son?

22   A.   I know I hired him.

23   Q.   My question, ma'am, is --

24   A.   Okay.

25   Q.   -- following the plea that your son entered, did you

1    ever contact Mr. Rion's office and ask him to withdraw the

2    plea?

3    A.    I'm not saying -- no, I didn't ask him to withdraw the

4    plea, but we went out of this door on that very date in a

5    heated discussion.

6    Q.    My next question to you is, following the plea, did

7    your son ever ask you to contact Mr. Rion's office and file

8    a motion to withdraw the plea?

9    A.    He wanted to withdraw the plea.  I can't tell you on

10    what date he wanted to withdraw the plea but he wanted to

11    withdraw the plea, most definitely.

12    Q.    Did you ever, from May 30th of 2017 to today's date,

13    ask Mr. Rion, Jon Paul Rion or John Senior, to withdraw the

14    plea in your son's case?

15    A.    I didn't ask him because I went forward with Mr.

16    Bennett.

17    Q.    To your knowledge, from May 30th, 2017, the day your

18    son entered the plea, until today's date, did he ever

19    contact Mr. Rion's office and ask them to withdraw his plea?

20    A.    Did who?  Mr. Bennett?

21    Q.    Your son.

22    A.    I can't tell you if he did or not.

23    Q.    You talked to him every day?

24    A.    I didn't talk him after he wasn't at my house every

25    day.  I talked to him every day for 2 weeks.  That's it.

1    Q.    In that 2-week period, did he ever tell you, "I reached

2    out and I want to withdraw my plea"?

3    A.    He didn't think he could withdraw the plea.  And if I'm

4    not mistaken, I think Rion told me once he signed the plea

5    the plea couldn't be withdrawn.  We was under that

6    understanding that it couldn't be withdrawn at that time.

7    Q.    At some point in time, did you terminate the services

8    of Mr. Rion's office?

9    A.    Yes, I did.

10   Q.    Then you hired Mr. Bennett?

11   A.    Yes.

12   Q.    When did you hire Mr. Bennett?

13   A.    I think it was in July, if I'm not mistaken.  I could

14   be wrong.

15   Q.    Your son pled guilty on May 30th of 2017.  He was

16   released on bond 2 days later, June 1st of 2017.  Was he

17   released on bond to your residence?

18   A.    Yes, he was.

19   Q.    How long did he remain at your residence?

20   A.    I believe it was 2 weeks, if that.

21   Q.    On June 19th of 2017, he was declared an absconder.  He

22   had cut off his ankle bracelet and fled, is that correct?

23   A.    Yes.

24   Q.    He was not arrested until October 17th of 2017, 4

25   months later?

1    A.   Correct.

2    Q.   As you testify today, do you know where your son was

3    between June and October of 2017?

4    A.   No, I do not.

5           MR. BENNETT:  Objection, Judge, relevance.

6           THE COURT:  I'm going to overrule it, Mr. Bennett.

7    I've allowed a lot of hearsay.  In a real sense this is a

8    sentencing hearing but I'd like to hear the answer to this

9    if for no other reason than to judge the witness's

10   credibility.

11          THE WITNESS:  No, I did not know where my son was.

12   BY MS. LAFFERTY:

13   Q.   So from June 19th of 2017 to October 17th at some point

14   in time you took it upon yourself to hire another attorney.

15   And that's Mr. Bennett, is that correct?

16   A.   Correct.

17   Q.   When you hired Mr. Bennett -- and you believe that was

18   July of 2017?

19   A.   I believe it was.

20   Q.   Did you ask him in July of 2017 to withdraw the plea?

21   A.   Yes.

22   Q.   Did he withdraw the plea?

23   A.   He said he would try.  He was going to do -- he said it

24   could either go 3 different ways.  That was one of the ways.

25   Q.   But my question is, you did not like this plea.

1    According to you, your son did not like this plea.

2    A.   He didn't understand this plea.

3    Q.   He maintained his innocence.  Just so we're clear, did

4    he say "I did it" or "I didn't do the offense"?

5    A.   He said he didn't do the offense on that particular

6    day, July 12th.

7    Q.   He maintains his innocence to the charge to which he

8    pled guilty under oath in this courtroom?

9    A.   Yes.

10    Q.   So because of that you hired Mr. Bennett and you wanted

11    to undo the plea, is that correct?

12    A.   Correct.  I wanted to undo the plea.

13    Q.   Was a motion to withdraw the plea filed in July of

14    2017?

15    A.   I'm not sure when it was entered.

16    Q.   August of 2017, September, October, November, December

17    2017?

18    A.   Like I said, I'm not sure when it was entered but I

19    know what I wanted to do.

20    Q.   Let me help you with that.  It was filed in March of

21    2018.  So 9 months after you hired him to withdraw the plea,

22    the plea was filed?

23    A.   Okay.

24    Q.   So you weren't happy with Mr. Rion's services early on.

25    Correct?

1   A.   Correct.

2   Q.   So you now have hired an attorney for the sole purpose

3   of withdrawing your son's plea?

4   A.   I hired Mr. Bennett to see what he can do for my son to

5   help his legal issues.

6   Q.   Did your son want the plea withdrawn back in June of

7   2017?

8   A.   Yeah, my son wanted the plea withdrawn.

9   Q.   Now let's talk about when your son was arrested in

10  October of 2017.  Did your son then demand that a motion to

11  withdraw his plea be filed?

12  A.   I don't know if he demanded that the motion be filed.

13  I don't know.  I asked Mr. Bennett could it be withdrawn.

14  Now whether my son, you know, we want to do this whole

15  secretive thing on phones that's being recorded.  There's

16  only so much I could say to my son.  I did know that he

17  wanted the plea to be withdrawn.

18  Q.   You said that your son is essentially naive, has no

19  familiarity with the legal justice system, is that correct?

20  A.   No, no felonies.  He might have a few misdemeanors, a

21  few run-ins but nothing very serious with the law.

22  Q.   You hired Mr. Rion's office.  His office has an

23  excellent reputation as a defense attorney, correct?

24  A.   That's what I thought, yes.

25  Q.   Then you hired Mr. Bennett who also has an excellent

1    reputation as a defense attorney?

2    A.    Yes.

3    Q.    Let's talk about your son's criminal background.  Your

4    son is how old right now, ma'am?

5    A.    He's 23.

6    Q.    So at age 18 he was charged with driving under

7    suspension in Dayton Municipal Court?

8    A.    Okay.

9    Q.    June 2013 he was charged in Vandalia Municipal Court

10   with attempted theft.  Did you obtain an attorney for him at

11   that time?

12   A.    No, I didn't.

13   Q.    Did he have an attorney?

14   A.    No, he didn't.

15   Q.    According to?

16   A.    Unless it was one appointed to him.

17   Q.    Then that would be an attorney, is that correct?

18   A.    Yes.

19   Q.    Then in October of 2013 he had another driving under

20   suspension.  October of 2014 another driving under

21   suspension, again with legal counsel.  April of 2015,

22   possession of marijuana and drug paraphernalia.  April of

23   2015, drug paraphernalia in New Lebanon, Ohio, again

24   represented by counsel.  August of 2017, driving under

25   suspension.  October of 2017, another driving under

1    suspension, represented by counsel.  February of 2016,

2    another driving under suspension.  Additional convictions

3    for reckless operation, speed, stop sign, a variety of

4    traffic offenses.  October of 2017 when he was arrested on

5    the instant offense.  He was charged with, again, driving

6    under suspension and provided a false means of

7    identification.  He's been arrested in 2014 for trafficking

8    in drugs.  2015 for possession of drugs.

9    A.    This is getting at?

10   Q.    October of 2015 for possession of marijuana.  February

11   of 2016 for possession of drugs.  March of 2016 for

12   possession of scheduled drugs.

13   A.    Are you trying to tell me that he did -- are these

14   questions for you to prove that he does have a run-in with

15   the legal system?

16   Q.    Yes.

17   A.    Okay.

18   Q.    So he has familiarity with the legal system?

19   A.    Not to this degree, ma'am.  Not to this degree.

20   Q.    Because this is a felony offense?

21   A.    Basically.  Not to this degree.  He's never been in

22   this type of trouble.

23   Q.    That's why --

24   A.    And he had a drug problem which probably led to all

25   these other offenses because that's just what happens to

1    people who has drug problems.  They do have run-ins with the

2    law.  It's not unheard of.  But this is something very

3    serious and he's never had any serious issues with the law.

4    Q.    I'm assuming, ma'am, because this is serious and

5    carries with it a hefty penalty, that's why you sought out

6    an experienced defense attorney?

7    A.    Exactly.  Yes, my son needed a lawyer and I got him

8    one.

9    Q.    Not only one, you had several.

10   A.    Several?  Meaning 3?

11   Q.    Yes.

12   A.    Or 2?

13   Q.    The day of your son's plea there were 2 attorneys

14   representing your son?

15   A.    One attorney which I've never known had anything to do

16   with my case.  I hired Jon Paul Rion.  Now where senior come

17   in, I don't know where he comes in at, but Jon Paul Rion is

18   the one I hired.  Then I hired Bennett.

19   Q.    One fact we know is that your son entered a plea on May

20   30th, 2017 and a motion to withdraw his plea was not filed

21   until March of 2018 on the eve of him getting sentenced, is

22   that correct?

23   A.    If that's what you say, I don't know if it's correct.

24   I'm sure you have the paperwork proving that.  So I'm pretty

25   sure it's correct.

1  Q.   Do you have any explanation on behalf of your son for

2  him failing to move to withdraw that plea any earlier?

3  A.   Because he was scared.  He was not -- I don't know

4  where he was.  So how can he withdraw a plea and he's not

5  around to withdraw the plea?  And by whom was he supposed to

6  withdraw it with?  I hired Mr. Bennett and he told me

7  certain ways it could go.  So I asked him, let's try to

8  withdraw the plea because that's what my son wants to do.

9  Q.   When your son was arrested in October of 2017, ma'am,

10 did you ask him, "where have you been for the past 4

11 months"?

12 A.   No, I didn't ask him where he'd been.

13 Q.   "Had you been held against your will?"

14 A.   I didn't ask him was he held against his will.

15 Q.   Did he have any ability to contact an attorney?

16 A.   Did who?  You're asking did I ask my son?

17 Q.   For a four-month period, did he have the ability to

18 pick up a phone and contact Mr. Rion's office and ask to

19 have his plea withdrawn?

20 A.   I can't tell you what abilities he had when he was on

21 the run because he was not with me.

22 Q.   Because he chose to abscond on his own?

23 A.   Because he was afraid.

24 Q.   He had the wherewithal to do that.

25 A.   He absconded because he was afraid.

1   Q.   As his mother, you never questioned him as to where he

2   was or how he took care of himself over a 4-month period?

3   A.   Yeah, because when I would talk to him, I would tell my

4   son, "You need to turn yourself in." I'm not the type of

5   mother that lets her son do the wrong thing. I always

6   encouraged him to do the right thing from day one. I'm

7   never in on anything negative with my son. I don't want a

8   negative son. I always push him to be a stand-up citizen

9   and do the right thing. I never would have told him "run,

10  son."

11       "Son, you need to turn yourself in."

12  Q.   When your son ran, he did not stand up and do the right

13  thing, is that correct?

14  A.   No. He ran because he was afraid. At that point he

15  didn't know what to do. The only reason you run is if

16  you're scared and you don't know what to do.

17  Q.   When he was arrested, on the day he was arrested and

18  provided someone else's identification, he wasn't doing the

19  stand-up thing either, was he?

20  A.   He was doing the scared thing. I was scared when my

21  son is out there. I was more afraid. I wanted my son to

22  turn himself in the day he left. I'm afraid.

23  Q.   Ma'am, when your son was represented by Mr. Rion's

24  office, did you ever have any communications with Mr. Rion

25  as to what your son was going to be pleading to on May 30th

1    of 2017?

2    A.    Rion gave me some plea that had so -- it was heavily

3    redacted.  Everything was crossed out.  I didn't know my son

4    was pleading to what he stood there in court and pleaded to.

5    There was a lot of things on that plea that I was not aware

6    of that was going to be on that plea.

7    Q.    The document that he provided you, do you have that

8    with you today?

9    A.    No, I don't have it with me.

10   Q.    Is it at your residence?

11   A.    It may be or it may be at his father's residence.  But

12   I assure you there's black lines all through the document.

13   Everything I was hearing is:  "Ms. Lafferty's working on it.

14   She's working on it.  She doesn't have it yet.  She's

15   working on it," all the way up until the day of court.

16   Q.    On the day of court, you heard everything that was said

17   on the record?

18   A.    Yes, I heard.

19   Q.    At any point in time, do you recall the Court asking

20   your son, "do you have any questions?"

21   A.    I recall that.

22   Q.    Did your son have any questions?

23   A.    I recall that.  Look, I believe Rion said:  If you go

24   in there and ask a certain way, the Judge is going to throw

25   out your plea.  He's going to throw out your plea at that

1   very moment.  My son wanted to come home.  That's the reason

2   he entered the plea because he wanted to come home because

3   he was in jail for 9 months and it was driving him crazy.

4   It was driving him insane.  He's a fragile person.  Whether

5   anybody wants to believe it or not, he's a fragile person

6   with a kind heart.  And he just did not know what he was

7   getting himself into when he signed that plea on May the

8   30th, if that's the date you said it was.

9   Q.   Ma'am, when you hired Mr. Rion to represent your son,

10  did you ever have any discussions with Mr. Rion as to what

11  the penalties were that your son could be facing for these

12  charges?

13  A.   We talked about it.

14  Q.   Do you recall Mr. Rion telling you that for this

15  particular charge in the federal system it carried with it a

16  mandatory minimum sentence of 20 years?

17  A.   He said that but he also said that, you know, it was

18  weak.

19  Q.   Let me ask you.

20  A.   I'm just saying.

21  Q.   As you testify today, my sole question to you is, do

22  you recall Mr. Rion telling you that this particular offense

23  carried with it a minimum mandatory term of 20 years?

24  A.   I remember Rion saying he's probably going to walk out

25  of there with 10 years, and that's not good enough.

1    Q.    You're the mother.  You're very interested in your

2    son's welfare.  You knew, going in, that the penalty was at

3    least a 20-year sentence.  He negotiated --

4    A.    If he was guilty, yes.  I heard it was a 20-year

5    sentence if he was guilty, if he was found guilty.

6              THE COURT:  Just a moment.  I'm going to ask each

7    of you to stop interrupting the other, if you would.

8              THE WITNESS:  Sorry, your Honor.

9              THE COURT:  That's no problem.  Put the question

10   to the witness.  Give her the opportunity to answer.

11             MS. LAFFERTY:  My apologies, your Honor.

12   BY MS. LAFFERTY:

13   Q.    Ma'am, the attorney that you hired to represent your

14   son, Mr. Rion, negotiated a deal with the United States for

15   a range of 168 to 210 months, 14 years to 17-1/2 years,

16   which is significantly lower than the 20-year sentence that

17   would otherwise be triggered, would you agree?

18   A.    I guess I would agree.

19   Q.    That if in fact your son didn't take that particular

20   plea and the case went to trial, it is now scored out to

21   what would be 292 to 365 months, that's the sentence?

22   A.    I don't know anything about 20 or 90.  I've never heard

23   that.

24   Q.    What I'm telling you is that as you testify today here

25   in court, your son's attorney negotiated a deal for 168 to

1    210 months.  Part of that was that he was intending to

2    cooperate with the United States upon his release from jail.

3    He didn't do that?

4    A.   He wasn't -- okay.

5    Q.   Would you agree he did not cooperate?

6    A.   I agree that he didn't have a chance to cooperate.  I

7    do agree to that.

8    Q.   There's no question your son cut off his ankle bracelet

9    and took off for 4 months, is that correct?

10   A.   That's correct, but that was when John Rion said you

11   need to turn yourself in.  He was backed up against the

12   wall.  If they'd have gave him more time which Mr. Rice said

13   if he needed more time he can get it.  If Rion was being

14   that lawyer, he would have asked for his client more time

15   versus "you need to turn yourself in."  I heard Mr. Rice

16   said if you need more time, that could be arranged.

17   Q.   Let me ask you.  When your son was home with you for

18   that two-week period, did your son, who has a drug abuse

19   problem, use marijuana at your house?

20   A.   Not to my knowledge.

21   Q.   Could he have used marijuana at your house without your

22   knowledge?

23   A.   Probably but it's very strong.

24   Q.   It's very strong.

25   A.   It's a very strong smell.  It's a very strong smell.

1    Q.    I would agree.  As far as education for your son, your

2    son did graduate from high school in 2014, is that correct?

3    A.    Correct.

4    Q.    And according to the final Presentence Investigation

5    report, your son did not have an IEP or an Individualized

6    Education Program in school?

7    A.    He did not have an IEP.

8    Q.    You made a comment in response to Mr. Bennett's

9    question earlier that as you heard the Plea Agreement being

10   read there were parts about it that you couldn't believe or

11   you disagreed with.  What parts of the Plea Agreement were

12   you in shock over?

13   A.    I just didn't understand that he was being charged with

14   the death of someone on a Plea Agreement.

15   Q.    Did you ever have those discussions with your son?

16   A.    What do you mean?  That it was going to be on the Plea

17   Agreement?

18   Q.    Yes.

19   A.    No.

20   Q.    When you heard in open court that he admitted

21   responsibility for causing the death of someone, you heard

22   the Judge explain that to him.  Do you recall that?

23   A.    I recall that because I wanted to stand up and shout.

24   Q.    And the Judge asked him if he admitted responsibility

25   for that offense.  Do you recall that?

1    A.    I'm not going to say I recall that exact statement but

2    it probably did happen because I'm sure the Judge did ask

3    him.

4    Q.    Do you recall the Judge asking or reading what's

5    referred to as a Statement of Facts which are the details of

6    what happened in this case?  Early on in the plea the Judge

7    set forth a series of events that took place.  At the end of

8    that the Court asked:  Do you understand that those are the

9    facts behind the charge of knowingly and intentionally

10   distributing a mixture or substance containing a detectable

11   amount of fentanyl to which you are pleading guilty?  Do you

12   recall that?

13   A.    Not -- I mean, I'm sure it was said.

14   Q.    But for certain individuals using --

15   A.    Excuse me.

16   Q.    -- the mixture or substance sold by you, the serious

17   bodily injury would not have occurred to CM, and JC's death

18   would not have occurred.  The Court asked your son if those

19   facts were true.  Your son replied "yes, sir."  Do you

20   recall that?

21   A.    No.

22   Q.    The Court then said, do you have any questions

23   whatsoever as to the meaning of the charge?  Your son

24   replied, "no, sir."  Do you recall that?

25   A.    I recall him saying "no, sir" to a lot of things, like

1   I said.

2   Q.   The Court then asked:  Do you have any questions as to

3   what it is you're pleading to?  Your son again replied, "No,

4   sir."

5   A.   Right because Mr. Rion said the way you go in here and

6   answer these questions determines whether you're going to

7   get out of here or not.  It determines whether this plea

8   will be thrown out and you get to go home.  That was my

9   son's main concern was to go home after being in jail for 9

10  months.  He didn't look far enough to see the consequences

11  of what signing that Plea Agreement would cause.

12  Q.   Your son, on the motion to withdraw his plea that was

13  filed, provided an affidavit.  Did you have an opportunity

14  to look at that affidavit, ma'am?

15  A.   Not in its entirety, no.  I didn't receive the

16  affidavit.

17  Q.   Nowhere in his affidavit does it indicate that Mr. Rion

18  told him to respond in any certain way?

19  A.   Okay.  I don't think that would be in the affidavit.

20  Q.   Nowhere in his affidavit did he say "I didn't

21  understand what I was pleading to on that particular day"?

22  A.   That's the whole reason to withdraw the plea because he

23  did not understand it.  So I don't know why that wouldn't be

24  in the affidavit because that's why he wanted to withdraw

25  the plea.

1   Q.   As we stand in court today, there is no testimony

2   whatsoever as to the fact that he did not understand that

3   plea?

4   A.   There should be testimony.  Whether his lawyer or Mr.

5   Rion wrote it, I'm not in control of that, but I know that

6   my son did not understand the plea.

7   Q.   We base that only on your representation of that's what

8   your son told you?

9   A.   Yes.

10  Q.   We have not heard that from your son?

11  A.   That's what my son told me.  Me and my son talk.  He's

12  my son.

13  Q.   Where was your son between June of 2017 and October of

14  2017?

15  A.   I don't know.

16          MS. LAFFERTY:  No further questions, your Honor.

17          THE COURT:  All right.  Mr. Bennett?

18          MR. BENNETT:  One moment, your Honor, please.

19          THE COURT:  Take your time.

20                     REDIRECT EXAMINATION

21  BY MR. BENNETT:

22  Q.   I've got one question, Ms. Hopkins.  When your son -- I

23  guess he was released from Montgomery County Jail, I don't

24  know, May 31st or May 30th of 2017?

25  A.   Uh-huh (affirmative response).

1    Q.    Your understanding was that he was supposed to

2    cooperate with the government when he was released, correct?

3    A.    Yes.

4    Q.    And 2 weeks transpired before they said, "Hey, look.

5    You need to turn yourself in."  Correct?

6    A.    Yes.

7    Q.    Do you know what, if anything, he did between those 2

8    weeks to help the government in the prosecution of others

9    involved in the crime?  Do you understand my question?

10   A.    Yes.

11   Q.    Do you know what he did?  Do you know if he tried to

12   help the government?  Do you know that?

13   A.    He tried to make phone calls.  That's all he could do

14   was try to make the phone calls, but he was confined to the

15   house.  Couldn't go on the porch.

16   Q.    You were working then, correct?

17   A.    Yes.

18   Q.    You worked what, 8-hour shifts?

19   A.    Yes.  Or longer.

20         MR. BENNETT:  Judge, I don't have any other

21   questions.

22         THE COURT:  All right.  Thank you, Mr. Bennett.

23   Ms. Lafferty?

24         MS. LAFFERTY:  I have nothing additional, your

25   Honor, thank you.

1          THE COURT:  Ma'am, I have a question or 2 if I

2     might.

3          THE WITNESS:  Okay.

4          THE COURT:  You indicated that there was a

5     counsellor at your son's school that he would talk to.

6          THE WITNESS:  Yes.

7          THE COURT:  I'm assuming you also talked to the

8     counsellor.

9          THE WITNESS:  I talked to her once or twice.

10         THE COURT:  What did she tell you?

11         THE WITNESS:  Just like I said like he's here but

12    he's not really here.  I can't seem to pull him in, to get

13    his attention.  He would sit and look out the window is what

14    she would say.

15         THE COURT:  You said about 3 years ago he entered

16    into a depression.  Was there any event that you can --

17    looking back on that might have caused that?

18         THE WITNESS:  Well, I can't.  I don't know what

19    caused the initial depression but he was very depressed.  On

20    top of that, he was shot in the leg, which even added to his

21    depression and he was just kind of messed up there for a

22    while.  He would have dreams and he was depressed and he

23    would cry and say he didn't want to be here.

24         THE COURT:  Was that before his depression or

25    after it had started?

1      THE WITNESS:  Was what before depression, your

2  Honor?

3      THE COURT:  This issue, being shot in the leg.

4      THE WITNESS:  That was after he got shot.  He was

5  already depressed when he got shot in the leg.

6      THE COURT:  You said that you and the Rions had a

7  heated discussion when you left the courtroom.  What was

8  that about?

9      THE WITNESS:  I didn't know why he would let my

10  son sign such a document.  I didn't know why.

11      THE COURT:  What was the response?  What did the

12  lawyer say?

13      THE WITNESS:  He said you're in a federal court

14  and you're acting like this.  That was his response.  I said

15  I'm sorry but I'm upset.  I don't think you should have had

16  my son to sign such a Plea Agreement.

17      THE COURT:  When Jon Paul Rion said he's going to

18  walk out with 10 years, when did he say that?

19      THE WITNESS:  John, he basically said that in the

20  beginning.  John Rion said that around arraignment.

21      THE COURT:  That was before the plea I take it.

22      THE WITNESS:  Yeah, that was before the plea.

23      THE COURT:  Two weeks after your son was released,

24  you say Mr. Rion told him to turn himself in.

25      THE WITNESS:  Yes.  They were having a

1    conversation on the phone and Rion told him that he needed

2    to turn his self in.  My son said, "Well, I need more time."

3    He was like, you can't get more time.  You need to turn

4    yourself in.  It basically freaked my son out, leading him

5    to cut the bracelet and run because he felt like he had no

6    other option.  He was afraid.

7         THE COURT:  Why did Rion -- I don't see how you

8    could know that.  I'm assuming that your son told Rion he

9    hadn't been able to accomplish much as far as cooperating

10   with the government.

11        THE WITNESS:  Uh-huh (affirmative response).

12        THE COURT:  Rion then told him to turn himself in.

13        THE WITNESS:  Yes.

14        THE COURT:  Is that basically what occurred?

15        THE WITNESS:  Yes.

16        THE COURT:  All right.  Mr. Bennett, any followup?

17        MR. BENNETT:  None, your Honor.

18        THE COURT:  Ms. Lafferty?

19        MS. LAFFERTY:  No, your Honor.  Thank you.

20        THE COURT:  All right.  Ma'am, you may step down.

21   Thank you.

22        THE WITNESS:  Thank you.

23        THE COURT:  Further witnesses, Mr. Bennett?

24        MR. BENNETT:  None, your Honor.

25        THE COURT:  Ms. Lafferty.

1          MS. LAFFERTY:  No, your Honor.

2          THE COURT:  Mr. Bennett, do you wish to argue the

3    matter?

4          MR. BENNETT:  I don't wish to argue the matter,

5    your Honor.  I would submit.  I would ask the Court to take

6    into consideration testimony that was adduced at the hearing

7    when the psychologist testified coupled with Ms. Hopkins.

8    But I don't have argument, Judge.

9          THE COURT:  All right.  Do you wish to brief the

10   matter?

11         MR. BENNETT:  No, your Honor.

12         THE COURT:  Ms. Lafferty, any argument?

13         MS. LAFFERTY:  Yes, your Honor, briefly.  In

14   determining whether or not Mr. Walker has met the Rule

15   11(d)(2)(B) standard in articulating a reason for his

16   withdrawal of the guilty plea, there are several factors the

17   Court considers.

18         One is the amount of time that elapsed between the plea

19   and the motion to withdrawn.  As indicated in

20   cross-examination, Mr. Walker entered a plea on May 30th of

21   2017.  A motion to withdraw that plea was not filed until

22   March of 2018, approximately 9 months after that plea had

23   been entered.

24         The second factor:  The presence or absence of a valid

25   reason for the failure to move for withdrawal earlier in the

1    proceedings.  As I questioned Mr. Walker's mother as to why

2    nothing had been filed in this particular case, she wasn't

3    able to provide an answer to that question.  Mr. Walker had

4    two attorneys, Mr. Rion, John and Jon Paul Rion, who

5    represented him in this matter.  If the facts played out as

6    his mother indicates, there is no reason why Mr. Walker on

7    his own couldn't have filed something with the Court

8    indicating that he wished to withdraw his plea.  He was at

9    his mother's house approximately 2 weeks and then on his own

10   volition took off for 4 months.  Upon his arrest in October

11   of 2017, certainly at that time when Mr. Bennett was

12   representing him, a motion to withdraw the plea could have

13   been filed.  If he was so adamant that he was innocent at

14   that point in time, such a filing could have been made.

15   Nothing was filed in this case until March of 2018, as we

16   were approaching his sentencing date.

17       The third factor:  Whether he has asserted or

18   maintained his innocence.  There was no indication that

19   Cameron Walker asserted his innocence.  Certainly in that

20   2-week period when he was allegedly cooperating with the

21   United States at no point in time did he maintain his

22   innocence.  At no point in time did he say that he didn't do

23   what he had done.  The only time that he has asserted his

24   innocence, according to the affidavit, is in March of 2018.

25       The fourth factor:  The circumstances underlying the

1      entry of the guilty plea.  I have in my possession I've

2      requested a copy of the plea colloquy that occurred on that

3      particular day.  During cross-examination I questioned his

4      mother as to certain questions posed by this Court to him

5      and the responses.  At no point in time did Mr. Walker

6      during the course of the plea, respond that he didn't

7      understand the nature of the plea, that he was not satisfied

8      with his attorney.  At no point did he give any indication

9      on the record that it wasn't a knowing and voluntary plea at

10     that time.

11          As to the fifth factor, the Defendant's nature and

12     background, I likewise listed for the record he did graduate

13     from high school.  Although he initially indicated he had an

14     IEP program in place, that in fact was not true.

15          He has a significant criminal history.  Albeit not a

16     history of felony offenses, he does have a list of offenses

17     where he was arrested, charged, went through judicial

18     proceedings and had the benefit of counsel at those

19     proceedings.

20          The seventh factor is the potential prejudice to the

21     government if the motion to withdraw is granted.  In this

22     particular case, Mr. Walker agreed to plead guilty,

23     cooperate.  Certainly if he withdraws his plea or if the

24     Court finds it necessary to withdraw his plea, it would have

25     potential prejudice to the government.  In this particular

1    case, the period of time that has elapsed would prejudice

2    the government in bringing this matter to trial but if

3    necessary the United States would go that route.

4         As indicated earlier to your Honor, in this particular

5    case Mr. Rion negotiated a plea on behalf of his client for

6    a range of 168 to 210 months.  He had the ability, according

7    to the terms of that Plea Agreement, to get as low as 120

8    months provided he cooperated with the United States.

9         As I indicated shy of that plea happening the original

10   charge carried with it a minimum mandatory term of 20 years.

11   In consulting with the probation department, the range would

12   have been 292 to 365 months.  So the plea that was

13   negotiated by Mr. Rion's office was extremely beneficial to

14   Mr. Walker and would have been even more so if he had opted

15   to continue to cooperate or cooperate at all.

16        Nothing additional, your Honor.

17             THE COURT:  Your 7th prong, prejudice to the

18   government, certainly you'd be prejudiced to the extent

19   you'd have to prove something that you thought you wouldn't

20   have to.  That's not what's meant by prejudice nor do you

21   claim it is.  Have you checked with these witnesses to see

22   if they're still available if, worst-case scenario, we have

23   to go to the trial?

24             MS. LAFFERTY:  I have not maintained contact with

25   the sole survivor in this particular case.  We were in

1    contact early on in the case.  We advised her that he had

2    entered a plea of guilty.  I have not maintained contact

3    with her since that time.  In speaking with the probation

4    department, it is my understanding that they have attempted

5    to reach her and have not had any luck contacting her.

6    Because I believe in the probation report they were seeking

7    a statement from her as it relates to being a victim of the

8    offense.  It's my understanding, in speaking with Ms. Wright

9    earlier today, that she has not had contact with her as of

10   today's date.

11           THE COURT:  Thank you, Ms. Lafferty.  Mr. Bennett,

12   response.

13           MR. BENNETT:  Judge, of course, if you grant the

14   motion to withdraw the plea, first of all, there is no

15   prejudice to the United States.  This case is not that

16   stale.  This matter was charged, initiated back in 2016.  We

17   stand before you now in March of 2018 a little bit more than

18   2 years later.  The government has not given you any

19   information at all that would indicate that they can't

20   procure evidence by way of exhibits and witnesses to

21   prosecute this matter at trial.  I haven't heard anything in

22   the record and I've heard nothing today indicating that the

23   government can't proceed to trial.  Federal cases typically

24   take sometimes a year and a half to 2-1/2 years to prosecute

25   or bring to trial.  We're within that timeframe.  First of

1    all, I don't think there's any showing of prejudice to the

2    government if the guilty plea is withdrawn.

3        Second of all, regarding circumstances surrounding the

4    guilty plea, if you look at the record and you look at the

5    transcript, one would come to the conclusion that there is

6    no way that the Defendant did not know or understand what he

7    was doing.  But I think as a learned jurist your Honor

8    should look further than that and look at the type of

9    individual you were dealing with.  You were dealing with a

10   fragile person.  That's a pretty good description that his

11   mother gave.  A fragile person that has a learning

12   disability that is immature and does not handle stressful

13   life events and does not typically receive, process, and act

14   upon things like a typical person would.  That's what the

15   evidence shows today.  That's what her testimony

16   demonstrated.  So the circumstances that you're looking at

17   is the transcript.  But the transcript will not reveal what

18   type of person you were dealing with.  The evidence adduced

19   at the hearing today shows that his constitution or his

20   intellectual fortitude or constitution.  More accurately,

21   Judge, the lack thereof and the lack of his development.

22   That transcends the circumstances that you see on that

23   transcript.  That transcends your colloquy.  That transcends

24   anything that he may have said that day.

25        Is it plausible, when you look at these circumstances

1    and the transcript says you asked him, "do you understand

2    what you're doing," he says yes, does that mean that he

3    really understood it or is he relying upon his attorney like

4    his mother said and is he dying to go home like a 20,

5    21-year-old boy would be when he's been sitting in jail for

6    9 months with his type of lack of development?  I think

7    that's very, very plausible.  I think we've shown you by

8    testimony that that is what transpired.  So the

9    circumstances in my mind surrounding the guilty plea, they

10   do indicate that this plea should be withdrawn.

11        The government says that, well, the claim on innocence

12   is diminished because it happened in March instead of 9

13   months before.  There's a claim of innocence.  In affidavit

14   he said he didn't do it.  His mother also corroborated and

15   substantiated his claim of innocence today in court.  The

16   fact that it's months later does not refute the fact that

17   before you now, you have an unequivocal claim of innocence

18   by the Defendant.  He was represented by 2 attorneys at the

19   plea hearing.  I think you've heard testimony that indicates

20   that he did not understand what he was doing,

21   notwithstanding the fact that 2 attorneys represented him.

22   At the end of the day he was like a child with a piece of

23   candy in front of him and he took it.  He took his

24   get-out-of-jail-free pass and he would do and say whatever

25   he had to do and say to get out of jail.  That's what

1    happened notwithstanding the fact that he was cloaked by 2

2    lawyers.

3        The last thing I would point out is that 9 months to

4    withdraw a guilty plea is not a long time when you take into

5    consideration for four of those months he was on the run for

6    whatever reason.  For whatever reason, he was on the run.  I

7    think that's relevant towards sentencing.  I don't

8    necessarily think it's probative of a guilty plea except to

9    the extent that it does show that you have a person that was

10   frightened by ignorance.  Frightened by not knowing what he

11   actually got himself into.  So he ran.  Because he didn't

12   understand the consequences of the Plea Agreement.  That's

13   also further corroboration of the fact that he entered the

14   plea just to get out.  When he had to come back in, he ran.

15   Because he really didn't know what he was doing when he

16   entered the plea.

17       What legal reasons his lawyer had for waiting 9 months

18   whether or not he wanted to go through the evidence and see

19   whether or not he could beat the case or whether or not he

20   exhausted all other remedies to resolving the matter in a

21   different fashion.  The alternative ways of representing

22   him.  That's beyond the scope and the providence of the

23   witness that testified and also Mr. Walker.  But

24   notwithstanding that, I don't think that's so long a period

25   of time that the motion and its claims lose credence.

1        Judge, the more I think about this, your Honor, this is
2   a case where the plea should be withdrawn when you look at
3   all the factors that the law requires you to.  That's all I
4   have, Judge Rice.
5           THE COURT:  Ms. Lafferty, you look as though you
6   wish to have the last word.  Have I misread you?
7           MS. LAFFERTY:  No, I do have comments.
8           THE COURT:  Please if you would come to the
9   podium.
10          MS. LAFFERTY:  As I indicated earlier, your Honor,
11  that particular Rule 11(d)(2)(B), the Sixth Circuit has
12  reiterated that and, I quote, the rule is designed to allow
13  a hastily entered plea made with unsure heart and confused
14  mind to be undone.  Not to allow a defendant to make a
15  tactical decision to enter a plea, wait several weeks, and
16  then obtain a withdrawal if he believes he made a bad choice
17  in pleading guilty.
18       In this particular case, your Honor, I spoke of the
19  timing of it, that it took 9 months for the plea to be
20  withdrawn.  I certainly am prepared to file a response in
21  this case but I would note that there are cases, Sixth
22  Circuit cases affirming denial of a motion to withdraw a
23  guilty plea that was filed 8 days after the plea was
24  entered, 2 weeks after the plea was entered, 6 days after
25  the plea was entered, 16 days after the plea was entered.

1    That particular factor alone is not dispositive, but I

2    certainly bring it to the Court's attention that in this

3    particular case it was a 9-month period.

4         Likewise, your Honor, a defendant's statements at a

5    plea hearing should be regarded as conclusive as to truth

6    and accuracy in the absence of a believable valid reason

7    justifying a departure from the apparent truth of those

8    statements.  To date we have not heard anything from Mr.

9    Walker as to why his representations at that plea hearing

10   were not in fact the truth.  His post-plea claims of

11   innocence in March of 2018 mock his courtroom declaration of

12   guilt under oath.

13        The last thing, your Honor, I want to again emphasize

14   the nature or circumstances of the entering of that plea of

15   guilty.  This Court was careful to ensure that Mr. Walker

16   was of sound mind to enter the plea, careful to ensure that

17   he had enough time to both consult with his attorney and

18   think about the plea offer.  The Court was careful to ensure

19   he understood his rights, the charge to which he was

20   pleading and the penalties associated with that charge.

21        The Court was careful to assure he understood the terms

22   of the Plea Agreement and that Plea Agreement was read into

23   the record.  So in the event he did not have an opportunity

24   to see it prior to it, the Court allowed him the opportunity

25   to hear it firsthand in the courtroom.

1    The Court made specific inquiry to ensure that his

2    decision to plead guilty was not the product of undisclosed

3    promises or threats.  The Court emphasized that the

4    Defendant did not have to plead guilty and that it was his

5    decision and his decision alone.  After this and careful

6    inquiry, the Court found that the Defendant was entering the

7    plea freely, knowingly, intelligent, and voluntarily, that

8    he completely understood what was at stake and he decided to

9    proceed under the Plea Agreement after careful consideration

10   with his attorney and he was making an informed judgment.

11        In light of all these factors, your Honor, the United

12   States believes it was evident there was no real confusion

13   or misunderstanding as to the terms of the Plea Agreement

14   and that the plea should stand.

15        THE COURT:  Thank you, Ms. Lafferty.

16        Mr. Bennett, as the moving party, you are entitled to

17   the last word if there's anything further you wish to

18   present to the Court.

19        MR. BENNETT:  Judge, there's only one point I

20   would like to make in closing.  First of all, the time

21   between the plea and the filing of the motion to withdraw,

22   that is a factor that in and itself is not a dispositive

23   factor.  What I would like to point out with respect to this

24   9-month period is 2 things.

25        First of all, for the first 5 months of that 9-month

1    period he was not available and he had absconded as the

2    Court knows and the record reflects.  So he was a fugitive

3    from June until November 2017.  When he came under my

4    counsel based on my interaction with Mr. Walker and his

5    family, it was crystal clear to me that he had some

6    psychological or mental infirmities or conditions that

7    needed to be addressed.  Thereafter, there was a psychiatric

8    evaluation and that report was published in January 2018,

9    less than 2 months before the filing of the motion.

10          I think the factor, the timing factor between the plea

11   and the actual motion to withdraw, there's a reason why

12   there was a 9-month period.  Again I close by saying when

13   you look at all the factors, the Court should allow the

14   Defendant to withdraw the plea.

15          THE COURT:  Thank you, Mr. Bennett.  The Court

16   will ask for a rough transcript of today's proceedings,

17   certainly a transcript of Dr. Marciani's testimony, if

18   that's not been prepared.  The Court will read again the

19   plea colloquy, and we will then issue an opinion, if the

20   Court is ready to rule.

21          In order to explain that last somewhat cryptic comment,

22   I would ask counsel and the court reporter to join me in the

23   conference room.  Marshals, I don't believe we need Mr.

24   Walker any further at this point.  Thank you.  We are in

25   recess.

1    (Recessed at 10:45 a.m.)

2    IN THE CONFERENCE ROOM

3    10:45 a.m.

4    THE COURT:  Interesting case.  A couple of

5    observations.  Let me speak my piece.  Then I'm going to ask

6    you to seal this part of the transcript.  After I've spoken

7    to counsel, I may decide to unseal it.  Obviously I

8    understand why Mr. Bennett didn't put his client on the

9    stand.  He achieved pretty much the same thing albeit by

10    hearsay through his client's mother whom I found reasonably

11    credible -- not reasonably credible -- whom I found

12    credible.

13    In a normal situation, I'd bend over backwards to try

14    to separate a defendant's desire to be released from custody

15    and the impending plea of guilty.  I don't want a person to

16    plead guilty simply because he wants to go home.  I say that

17    in every case where there's that possibility there will be

18    that linkage in the Defendant's mind.

19    In this case, if you read the plea colloquy, I know you

20    both have, I again addressed this issue.  Indeed, as I

21    recall, Sheila, you wanted to separate the issues.  You

22    wanted the bond issue addressed after the plea.  Jon Paul

23    wanted it addressed at the time of the plea.

24    What is unusual about this case is -- and this should

25    be on the record.  You may or may not know it, Clyde.

1  Sheila came to me and said, the government is not opposed to

2  a release in this case based on the Defendant's promise to

3  help the government.  That was a reasonable request.

4  Indeed, the plea colloquy indicates that if in fact he does

5  help the government that the guideline range, the lower part

6  will go down to 120 months which obviously is the genesis of

7  John Rion's statement, whenever it was made, that he'll walk

8  out with 10 years.

9       In a typical case, I would say to the government and

10  new defense counsel that I want to hear from Mr. Rion.  The

11  problem, Clyde, if I do, I may decide -- may; I don't

12  know -- to allow your client to withdraw his plea of guilty.

13  Therefore giving you what you're praying for, but that might

14  wind up in the long run hurting your client.

15            MR. BENNETT:  I understand that, Judge.

16            THE COURT:  That's the conundrum.  As far as

17  prejudice to the government, Ms. Lafferty, because she's

18  candid to the nth degree, has indicated that the sole

19  surviving witness is not presently locatable, but I assume

20  that they can surmount that by finding the individual.

21       So I guess my point is, I'm willing to go ahead and say

22  please call Mr. Rion as long, Clyde, as you're willing to

23  accept the possible consequences.  I felt I had to tell you

24  that.  I have no idea, other than what the mother said, and

25  I haven't heard the other side of the story if in fact there

1    is one.  I don't know when the Plea Agreement was presented.

2    I don't know the extent to which Mr. Rion briefed Mr. Walker

3    on the impending Plea Agreement as it was being worked out

4    between Mr. Rion and Sheila.  Give me one minute.

5        I simply don't know what transpired between, Clyde,

6    your client and his then attorney.  If you wish to pursue

7    your motion to withdraw, I have respect for that.  I'm going

8    to ask Sheila to call John Rion or Jon Paul Rion.  I need a

9    complete record.  That's all there is to it.

10        MR. BENNETT:  We're going to go forward with the

11    motion.

12        THE COURT:  Sheila, how do you wish to proceed as

13    far as contacting Jon Paul Rion?

14        MR. BENNETT:  Can I say something before you do?

15        THE COURT:  Yes.

16        MR. BENNETT:  I want to be clear on the record

17    because I want to be candid.  I have been in conversation

18    with Mr. Rion.  I didn't want the Court to think I haven't

19    spoken to him.  I've spoken to him at length about this

20    issue.

21        THE COURT:  I know you did because you're too good

22    an attorney not to have had.

23        MR. BENNETT:  Right.

24        MS. LAFFERTY:  Judge, I can certainly reach out to

25    him.  I think the Court needs to at least put on an entry

1    allowing him to waive attorney-client privilege so that

2    he'll speak candidly.

3         THE COURT:  Certainly, I will.  Really I can't

4    force Mr. Walker to waive the attorney-client privilege.  It

5    belongs to Mr. Walker.  That's strictly up to Clyde to

6    discuss with his client.  I'll discuss the mechanics of that

7    in a moment.

8         I would say I'm not naive enough to have heard for the

9    first time that attorneys say to their client, "Now you've

10   got to answer the Judge's question in a certain way."  It's

11   not the first time I've heard that.

12        Clyde, again -- and you don't have to answer that

13   question here -- I'm going to set a conference call the

14   middle of next week.  I can call John Rion.  I can subpoena

15   him but the extent to which he testifies is up to your

16   client.  And what I'd like you to do is chat with your

17   client between now and then --

18             MR. BENNETT:  I will, Judge.

19             THE COURT:  -- to get an answer.

20        Sheila, anything.

21             MS. LAFFERTY:  I don't believe so, your Honor.

22   Does the Court want to schedule a followup telephone

23   conference?

24             MR. BENNETT:  That's what he said; a status

25   conference.

1          THE COURT:  Clyde, anything?

2          MR. BENNETT:  Nothing, your Honor.

3          THE COURT:  I need a telephone call late in the

4    afternoon if it's convenient with counsel maybe Thursday.

5    Does that give you enough time, Clyde?

6          MR. BENNETT:  Yes, your Honor.

7          THE COURT:  There's no reason why that can't be

8    unsealed.

9          Thursday at 4:45.

10         Sheila, anything else?

11         MS. LAFFERTY:  I don't believe so, judge.

12         THE COURT:  Clyde.

13         MR. BENNETT:  Nothing else, your Honor.

14         THE COURT:  Thank you 2 for your courtesies.  Have

15   a great weekend.

16         (Proceedings concluded at 10:57 a.m.)

17                   - - -

18

19

20

21

22

23

24

25

```
1                          CERTIFICATE

2          I, Debra Lynn Futrell, Federal Official Court

3   Reporter, in and for the United States District Court for

4   the Southern District of Ohio, Western Division at Dayton,

5   do hereby certify that the foregoing pages constitute a true

6   and correct transcript of the stenographically reported

7   proceedings held in the above-entitled matter, on the date

8   indicated, to the best of my ability and knowledge,

9   transcribed by me.

10

11  s/Debra Lynn Futrell,

12  Debra Lynn Futrell
    Federal Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```